ST. JOSEPH HOSPITAL, Petitioner,

v.

Stacy Lynn WOLFF, and Ray Wolff and Sandra Wolff, individually, and as next friends of Stacy Lynn Wolff, Respondents.

No. 99–1192.

Supreme Court of Texas.

Argued Sept. 20, 2000.

Delivered Nov. 5, 2002.

Rehearing Denied Feb. 13, 2003.

Reagan Wm. Simpson, Fulbright & Jaworski, Houston, Stephanie A. Smith, Fulbright & Jaworski, Austin, for Petitioner.

Michael Ernest Archuleta, Michelle Mei-Hsue Cheng, Bill Whitehurst, Whitehurst Harkness Ozmun & Archuleta, Pamela Stanton Baron, Austin, for Respondents.

Justice MOSELEY[1] delivered the judgment of the Court in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, Justice O'NEILL, and Justice JEFFERSON joined, and an opinion in which Justice HECHT, Justice OWEN, and Justice JEFFERSON joined.

This case involves whether a teaching hospital that sponsors a medical residency program is vicariously liable for a resident's negligent treatment of a patient, occurring while the resident, as part of the residency training program, was receiving training at another hospital under the immediate supervision of another medical institution's agent. To answer this question we must reexamine, among other theories of vicarious liability, the particular theory often referred to as "joint enterprise" liability.

We conclude there is no evidence to support the jury's findings of joint enterprise, joint venture, "mission" or non-employee respondeat superior, or ratification. We also conclude the undisputed evidence proved conclusively, or as a matter of law, that when the resident treated the patient he was acting as the borrowed employee of the medical institution supervising him. Therefore, we reverse the judgment of the court of appeals[2] and render judgment that the plaintiffs take nothing by way of their claims against the teaching hospital.

## I. BACKGROUND

### A. Introduction

In May 1994, Stacy Wolff was severely injured when an automobile in which she was a passenger collided with a truck. She was flown by medical helicopter to Austin's Brackenridge Hospital, where she was admitted to intensive care and placed on a ventilator. Her attending physician, Dr. David Harshaw, and a third-year resident, Dr. Mario Villafani, performed a tracheostomy on Wolff and inserted a breathing tube in her throat.

Several days after the tracheostomy, Wolff began to bleed from the surgical wound. Villafani examined Wolff but decided not to alert Harshaw, Harshaw's substitute, or the chief resident, none of whom were at the hospital at the time.

---

1. Honorable Jim Moseley, Justice, Fifth District Court of Appeals, sitting by commission of Honorable Rick Perry, Governor of Texas, pursuant to TEX. GOV'T.CODE § 22.005.

2. 999 S.W.2d 579.

Shortly after one particularly severe bleeding episode, Wolff went into cardiac and respiratory arrest. She survived but suffered permanent, severe brain damage.[3]

At all times during his treatment of Wolff, Villafani was enrolled in an integrated general surgery residency program. The program was operated by St. Joseph Hospital ("St. Joseph") in Houston, the sponsoring institution, and the Central Texas Medical Foundation ("Foundation"), a participating institution. The Foundation is a certified health organization operated by physicians under Texas law[4] that was formed for the purpose of operating a residency program. The Foundation is based in Austin. Harshaw, Wolff's attending physician, was also the Foundation's Director of Surgical Education.

### B. Lawsuit

Wolff and her parents sued a number of defendants, some for having caused the vehicle accident and others for medical malpractice. Before trial, the Wolffs either settled with or dismissed all defendants except St. Joseph. At the close of evidence, the trial court submitted questions to the jury based on five vicarious liability theories asserted by the Wolffs: employment, joint enterprise, joint venture, "mission," and ratification. The trial court refused St. Joseph's request to instruct the jury as to the law regarding a "borrowed employee."

The jury found that:

- 85% of the negligence that proximately caused Wolff's cardiac respiratory arrest resulting from her tra-

cheoinnominate fistula—a serious, permanent, and disabling injury—was attributable to Villafani;

- on the occasion in question, St. Joseph and the Foundation were engaged in a joint enterprise;

- on the occasion in question, St. Joseph and the Foundation were engaged in a joint venture;

- on the occasion in question, Villafani was employed by each of St. Joseph, the Foundation, and the joint venture, and was acting within the scope of his employment with each;

- Villafani treated Wolff in furtherance of a mission for the benefit of St. Joseph, the Foundation, and their joint venture and was subject to their control as to the details of the mission;

- St. Joseph, the Foundation, and their joint venture ratified Villafani's conduct; and

- Wolff's and her parents' damages totaled $9.5 million.[5]

The trial court rendered judgment against St. Joseph on the verdict, but credited St. Joseph with $2.75 million the Wolffs received from the settling defendants.

### C. Appeal

The court of appeals affirmed, holding that: (1) the trial court did not abuse its discretion in the manner in which it defined "joint enterprise" in the jury charge; and (2) there was sufficient evidence to support the jury's finding that St. Joseph and the Foundation were engaged in a joint enterprise.[6] Because those findings

---

3. It is undisputed that Wolff's bleeding, which led to her subsequent respiratory and cardiac arrest and her resulting brain damage, was caused by a tracheoinnominate fistula—an erosion between the trachea and the innominate artery, or brachiocephalic trunk.

4. Medical Practice Act, Tex. Occ.Code § 162.001(b).

5. The trial court instructed the jury not to include in its damage findings "any amount for [Wolff's] closed head injury resulting from the automobile collision...."

6. 999 S.W.2d at 587–91.

alone supported the trial court's judgment, the court of appeals did not address whether the evidence supported any other liability theory.[7]

The court of appeals also concluded that the joint enterprise finding rendered harmless any error in the trial court's refusal to instruct the jury regarding the law on "borrowed employees" because both participants in the enterprise, St. Joseph and the Foundation, were jointly liable for all of the enterprise's actions.[8] Finally, the court of appeals determined that the trial court's error in refusing to ask the jury to determine the extent of the drivers' responsibility for Wolff's injury was harmless because the trial court instructed the jury not to award damages for injuries caused by the automobile accident.[9] This Court granted St. Joseph's petition for review.[10]

### D. Issues

St. Joseph contends the court of appeals erred in affirming the trial court's judgment, attacking each of the vicarious liability theories asserted by the Wolffs. Generally, St. Joseph disputes the legal sufficiency of the evidence as to at least one element of the jury's findings relevant to each of the Wolffs' theories of recovery; St. Joseph also complains of charge error. Conversely, the Wolffs argue: (1) the trial court properly rendered judgment against St. Joseph based on its vicarious liability for Villafani's negligence under each theory; (2) the court of appeals properly affirmed the judgment based on the joint enterprise theory; and (3) the trial court's judgment can be upheld on any of their other theories of recovery.

### II. EVIDENCE

Critical to our discussion of these issues is an understanding of the evidence concerning the relationships among St. Joseph, the Foundation, and Villafani. To evaluate the legal sufficiency of the evidence to support a finding, we must "determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions."[11] Thus, we "consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor."[12] Although it is often stated that a reviewing court performing a no-evidence review must disregard all evidence contrary to the finding in question, we need not "disregard undisputed evidence that

---

7. *Id.* at 591 n. 16.

8. *Id.* at 592.

9. *Id.* at 594–95.

10. After the case was argued and while it was under submission, JUSTICE GONZALES and JUSTICE ABBOTT resigned from the Court. JUSTICE RODRIGUEZ, who was appointed to replace JUSTICE ABBOTT, recused himself from participation in the decision of the case. CHIEF JUSTICE PHILLIPS certified that fact to the Governor, who thereupon commissioned to the Court the Honorable James A. "Jim" Moseley, Justice of the Court of Appeals for the Fifth District of Texas at Dallas, to participate in deciding the case. *See* TEX. GOV'T CODE § 22.005.

11. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994).

12. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998) (citing *Harbin v. Seale*, 461 S.W.2d 591, 592 (Tex.1970)); *see also Burt v. Lochausen*, 151 Tex. 289, 249 S.W.2d 194, 199 (1952); *Moriel*, 879 S.W.2d at 24 (" 'The evidence presented, viewed in the light most favorable to the prevailing party, must be such as to permit the logical inference [that the jury must reach].' ") (quoting *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 600 (Tex.1993)); Hall, *Standards of Review in Texas*, 29 ST. MARY'S L.J. 351, 481–82 (1998).

allows of only one logical inference." [13] Nevertheless, we sustain a no-evidence point only if there is no more than a scintilla of evidence proving each element of joint enterprise. [14] It is from this perspective that we review the record.

## A. Accredited Residency Programs

After completing medical school, medical students receive an M.D. degree and are eligible to continue their training in a graduate medical education program, commonly referred to as a residency program. [15] Residency programs focus on developing clinical skills and professional competencies and preparing the physicians in the programs ("residents") to practice in a medical specialty. Residency training takes place primarily through the residents' provision of patient care while under the supervision of more experienced physicians. During the course of a residency, the resident takes on progressively greater responsibility for patient care. [16]

Medical residency programs are accredited under the general authority of the Accreditation Council for Graduate Medical Education ("ACGME"). [17] St. Joseph's general surgery residency program was accredited by ACGME, which has rigorous, detailed requirements for residency programs. Among other things, ACGME requires that "[a] residency program must [operate under the authority and control of] a sponsoring institution." [18] However, general surgery residency programs are sometimes multi-institutional. Sponsoring institutions that cannot provide sufficient resources and clinical experience within their own facilities may make arrangements with other entities, called "participating institutions," [19] to provide additional resources and experience. [20] A participating institution may be "integrated" with the parent or sponsoring institution through an agreement that must specify, among other things:

> [T]hat the program director of the parent institution: 1) appoints the members of the teaching staff at the integrated institution; 2) appoints the chief or director of the teaching service in the integrated institution; 3) appoints all residents in the program; and, [sic] 4) determines all rotations and assign-

13. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 51 n. 1 (Tex.1997) (citing *Wininger v. Ft. Worth & D.C. Ry. Co.*, 105 Tex. 56, 143 S.W. 1150, 1152 (1912) and *Tex. & N.O. Ry. Co. v. Rooks*, 293 S.W. 554, 556–57 (Tex. Comm'n App.1927) (overruling motion for rehearing)).

14. *See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex.1999); *see generally* Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L.Rev. 361, 362–63 (1960).

15. American Medical Association, 1993–1994 Graduate Medical Education Directory 9 (1993). The Directory was marked and introduced into evidence as Plaintiff's Exhibit 70.

16. *Id.*

17. *Id.* The ACGME is a voluntary association of five organizations: The American Board of Medical Specialties, the American Hospital Association, the American Medical Association, the Association of American Medical Colleges, and the Council of Medical Specialty Societies. Accreditation is the responsibility of the ACGME, the Transitional Year Review Committee (which is appointed directly by the ACGME), and Residency Review Committees ("RRCs") for the various practice specialties. The RRC for a general surgery residency program, like the one involved here, is sponsored by the American Board of Surgery, the American College of Surgeons, and the AMA Council on Medical Education. *Id.* at 9–11.

18. *Id.* at 11.

19. *Id.*

20. *Id.* at 140.

ments of both residents and members of the teaching staff.[21]

Although the "general rule" is that the sponsoring and participating institutions providing a general surgery residency program should be in close geographic proximity, this is not an absolute requirement.[22] Thus, general surgery residents may treat patients at a participating institution some distance away from the sponsoring institution.[23]

A sponsoring institution "assumes the final responsibility for a program of graduate medical education"[24] and "must assume responsibility for the educational quality of its sponsored program(s)."[25] However, in general surgery residency programs, the ACGME recognizes that the patient's attending physician is responsible for that patient's care and requires the attending physician to supervise any residents involved in providing that care:

> The attending physician has both an ethical and a legal responsibility for the overall care of the individual patient and for the supervision of the resident involved in the care of that patient. Although [senior residents] require less direction than junior residents, even the most senior resident must be supervised. A chain of command that emphasizes graded authority and increasing responsibility as experience is gained must be established. Judgments on this delegation of responsibility must be made by the attending surgeon who is ultimately responsible for the patient's care; [such judgments shall be] based on [the attending surgeon's] direct observation and knowledge of each resident's skills and ability.[26]

## B. The Program Contract

St. Joseph and the Foundation entered into a written contract ("the Program Contract"), which stated that St. Joseph operated a general surgery residency program and wished to "provide extensive experience in general surgery for the surgical residents in training." The Program Contract also stated that the Foundation provided health care treatment at Brackenridge Hospital (which is owned by the City of Austin) through residency training programs and the Foundation "desire[d] the services of postdoctoral surgical residents to assure the availability of qualified surgeons in the future." Accordingly, the Program Contract recited that St. Joseph and the Foundation wanted to "establish an Integrated General Surgery Residency Program at Brackenridge Hospital, as an integral division of St. Joseph['s] General Surgery Residency [P]rogram." The program would be conducted according to ACGME requirements.

The Program Contract envisioned two people overseeing the integrated residency program and the relationship between St. Joseph and the Foundation. One person, the Academic Chief of General Surgery, was to be appointed by St. Joseph. The other person, the Director of Surgical Education, was to be appointed by the Foundation, subject to review and approval by St. Joseph's Academic Chief and Director of Medical Education.

The Program Contract also provided, among other things, that:

- the St. Joseph-appointed Academic Chief was responsible for "direct[ing]

21. *Id.*

22. *Id.*

23. *See id.*

24. *Id.* at 11.

25. *Id.* at 9.

26. *Id.* at 140.

the total General Surgery Residency Program"; appointing residents to the program; providing for their training (via St. Joseph's teaching staff) while they were assigned to St. Joseph Hospital; and assigning residents for training with the Foundation in Austin (subject to the Foundation's approval).

- the Foundation-appointed Director was responsible for supervising (via the Foundation's teaching staff) the residents while they were assigned to the Foundation; consulting with the Academic Chief on "matters related to the academic aspects of the Integrated Program"; appointing members of the Foundation's surgical teaching staff (subject to the Academic Chief's approval); and making specific training assignments of residents and teaching staff of the Foundation (again subject to approval).

- the assignment of residents to the Foundation by the Academic Chief was subject to the Foundation's prior approval, which could be withdrawn with written notice if a resident failed to meet the Foundation's standards. On withdrawal of approval, the Foundation could immediately suspend the resident from any activities at Brackenridge.

- the Foundation would pay a pro-rata share of a resident's stipend while the resident was assigned to and on rotation with the Foundation. A resident assigned to the Foundation would also receive from St. Joseph any fringe benefits agreed to between them, but the Foundation would reimburse St. Joseph for the costs of those benefits. The Foundation would also pay the residents a housing stipend.

- St. Joseph would provide residents with professional liability insurance coverage.

- the Director could participate in recruiting residents for the program, but the Foundation was not responsible for recruiting or selecting residents or for St. Joseph's recruiting costs.

With regard to patient care, the Program Contract contained the following provision, referring to the Foundation as "CTMF":

G. The residents assigned to the Integrated Program will *provide direct patient care under the supervision of the teaching staff of CTMF*. CTMF's teaching staff will be under the supervision and direction of CTMF's Director of Surgical Education. While in supervised clinical training as provided for in this contract, *each resident will be immediately responsible to the member of CTMF's teaching staff*, designated by CTMF's Director of Surgical Education, under whose direct clinical supervision and control the resident is working. CTMF's Director of Surgical Education will be responsible to St. Joseph Hospital's Academic Chief of General Surgery for meeting the academic needs of the residents in the Integrated Program while they are training with CTMF. St. Joseph Hospital's Academic Chief of General Surgery will cause supervised clinical training of each resident to be provided by the physician-practitioner members of St. Joseph Hospital's general surgery teaching staff who are responsible for the supervised clinical training of the residents in St. Joseph Hospital's General Surgery Residency Program when the residents in the Integrated Program are assigned to St. Joseph Hospital. CTMF will not control the details of the medical tasks performed by the residents at St. Joseph Hospital; furthermore, *St. Joseph Hospital will not control the details of the*

*medical tasks performed by the residents when they are assigned to CTMF save through consultation between and the mutual consent of the Academic Chief of General Surgery at St. Joseph Hospital and CTMF's Director of Surgical Education.[27]*

Finally, the Program Contract stated it was subject to a contract (the "Services Contract") between the Foundation and the City of Austin, which was incorporated into the Program Contract by reference, and that the Program Contract would terminate immediately if the Services Contract was terminated or discontinued for any reason. Also, in the event of a conflict between the terms of the Program Contract and the Services Contract, the latter would control.

## C. The Services Contract

The Services Contract was a written contract between the Foundation and the City of Austin. Under its terms the Foundation agreed, through its interns, residents, and faculty, to "provide comprehensive inpatient and outpatient care" to patients at Brackenridge Hospital and other locations in the Austin area. The Services Contract was not limited by its terms to the provision of surgical services, but also included services to be rendered by residents in other specialties.

The financial provisions of the Services Contract are important to the issues before us, and we look at them in some detail. The City agreed to pay the Foundation a maximum amount specified in a "Current Operating Budget" addendum to the Services Contract.[28] In return, the Foundation agreed to treat, at no charge to the City or the patient, so-called "MAP Patients," who were patients eligible to receive medical care at Brackenridge Hospital and other facilities under the City Medical Assistance Program.

Although the Foundation could not charge the City or the MAP Patients for their health care, it was authorized to charge or make claims against any public assistance programs or private insurers that might be responsible for those health care costs. As for non-MAP Patients, the Services Contract provided that the Foundation could charge them "individually or through their third party coverage for services rendered." The Services Contract specifically provided that all funds collected by the Foundation "shall be the property of the Foundation."[29]

## D. Residents

Villafani, like other residents, had a written contract with St. Joseph but not

27. Emphasis added.

28. If the Services Contract were terminated without good cause, the City also agreed to pay the Foundation the stipend or salary of certain residents and faculty physicians who continued to provide services to the City, as well as a "wind-down" sum of money for a period of sixty days after contract termination.

29. The Services Contract also provided, among other things, that the Foundation would:
- manage, operate, and supervise the Foundation's Medical Education Program and provide sufficient medical faculty and administrative support personnel to accomplish the task;
- "plan, develop and operate" the program in accordance with ACGME requirements and "in consultation with" Brackenridge Hospital's management and would follow Brackenridge Hospital's medical staff procedures; and
- perform all of its services as an independent contractor.

The Services Contract further stated that the arrangement between the Foundation and the City would "not be construed as creating a partnership or joint venture...."

with the Foundation. His contract obligated St. Joseph to provide him residency training "to acquire additional clinical judgment and proficiency for the practice of medicine." The contract provided that Villafani would "undertake [his] duties and obligations as an independent contractor engaged in graduate medical work and specialization," but St. Joseph would determine his "professional duties and standards of medical practice." St. Joseph agreed to pay Villafani a stipend, to give him three weeks of vacation, and to provide him uniforms, laundry service, a parking space, life and health insurance, a room when assigned to night duty, and professional liability insurance.

Although Villafani's contract with St. Joseph stated that Villafani would not be "the Hospital's employee or agent," St. Joseph withheld taxes, social security, and Medicare from Villafani's paycheck and reported his wages and the amounts withheld to the IRS on a Form W–2, which is used for employees. Also, while the contract stated that Villafani would "not be eligible for the Hospital's benefit programs," in fact St. Joseph allowed Villafani to participate in its employee benefits.

### E. Other Related Matters

The record contains evidence that the Foundation reimbursed St. Joseph for residents' (including Villafani's) salaries and benefits while they were on rotation with the Foundation. As an administrative practice, the Foundation made these payments from the revenue it collected from operating the program. The Foundation also paid residents (including Villafani) a housing stipend during their rotation at Brackenridge and provided workers' compensation insurance. While Villafani was on rotation at Brackenridge, the Foundation set Villafani's work schedule and considered him to be its employee, but St. Joseph set Villafani's vacation time and sick leave.

In addition, the record contains evidence that:

- The Foundation made a slight profit from its involvement in the general surgical residency program, while St. Joseph incurred a significant loss.

- Sponsorship of a residency program enhances an institution's stature in the medical community.

- Physicians are drawn to a hospital that has residents available to assist with patient care at lower rates, thereby increasing both the hospital's business and its profit margin.

- As the sponsoring institution, St. Joseph received federal Medicare payments based on the number of residents in the general surgery residency program. There is no evidence it shared these payments with the Foundation.

- Institutions involved in residency training have an opportunity to recruit residents to stay and practice in their communities after they finish their training.

- Harshaw, the Director of Surgical Education appointed by the Foundation to oversee the integrated surgical residency program, was also Wolff's attending physician. He assigned Villafani to assist him in providing Wolff's medical care.

- Villafani, a third-year resident, was also supervised by fourth and fifth-year residents. Harshaw, the chief resident, and Villafani did not take direction from anyone at St. Joseph regarding any part of Wolff's treatment. No one with St. Joseph participated in Wolff's care in any way.

We now consider St. Joseph's arguments with respect to each of the vicarious liability theories asserted by the Wolffs.

### III. JOINT ENTERPRISE

The trial court asked the jury whether, "[o]n the occasion in question," St. Joseph and the Foundation were engaged in a joint enterprise and instructed them that a joint enterprise exists:

> if the persons or entities concerned have (1) an agreement, either express or implied, with respect to the enterprise or endeavor; (2) a common purpose; (3) a common business or pecuniary interest; and (4) an equal right to direct and control the enterprise.

To this the trial court added: "To have an 'equal right of control,' an entity must have an authoritative voice or must have some voice and right to be heard." The jury found that a joint enterprise existed.

### A. Charge Error

■ St. Joseph first argues the trial court erred in submitting the above definition over its objection because the definition misstated the law and the court of appeals erred in overruling its objection. St. Joseph specifically objected that the charge improperly defined the third element of a joint enterprise as the existence of "a common business or pecuniary interest" and tendered an instruction tracking the language used in the Restatement of Torts that there must be a "community of pecuniary interest in that [common] pur-

pose, among the members [of the group]."[30] Thus, St. Joseph properly preserved any error arising from the charge's definition of joint enterprise.[31]

■ As the court of appeals recognized, St. Joseph's argument is not about the form of the definition submitted; rather, St. Joseph contends that the court's definition misstated Texas law concerning a joint enterprise. Whether a definition used in the charge misstated the law is a legal question. Thus, the court of appeals properly reviewed the issue de novo, as do we.[32]

Most discussions of joint enterprise liability in Texas begin with our 1974 opinion in *Shoemaker v. Estate of Whistler*.[33] That case involved a claim for damages resulting from an airplane crash that occurred during a voluntary Civil Air Patrol search mission. The plaintiff, a surviving parent of one of the persons killed in the search plane's crash, sought to impute the negligence of the plane's pilot-owner to a passenger-owner, rendering the latter's estate liable for damages.[34]

After recounting the facts of the case and the historical foundations of the joint enterprise doctrine, *Shoemaker* quoted and expressly adopted the Restatement's definition of a joint enterprise, including the requirement that, between the members of the group, there be "a community of pecuniary interest in that [common] purpose."[35] In order to faithfully set the

---

**30.** RESTATEMENT (SECOND) OF TORTS § 491 cmt. c(3) (1965).

**31.** *See* TEX.R. CIV. P. 272–274, 278, 279.

**32.** 999 S.W.2d at 586; *see also* TEX.R. CIV. P. 277; *M.N. Dannenbaum, Inc. v. Brummerhop,* 840 S.W.2d 624, 631 (Tex.App.-Houston [14th Dist.] 1992, writ denied) (stating that an instruction is improper if it misstates the law).

**33.** 513 S.W.2d 10 (Tex.1974).

**34.** *Id.* at 11–12.

**35.** *Id.* at 16–17 (affirming a take-nothing judgment because there was no evidence of a community of pecuniary interest in the common purpose of the enterprise in question— the Civil Air Patrol search).

stage for our analysis, we quote *Shoemaker* extensively:

> A codification of the business or commercial characterization of joint enterprise is set forth in The Restatement 2d of Torts § 491 (1965) where it is stated at comment c: "The elements which are essential to a joint enterprise are commonly stated to be four: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. Whether these elements exist is frequently a question for the jury, under proper direction from the court." While several courts have embraced the "community of pecuniary interest" element set forth in the Restatement, others have articulated this element in terms such as a "common business purpose," a "common financial interest," a "common pecuniary objective," or a "venture for profit in a financial or commercial sense." The courts that have restricted joint enterprise to the business or commercial context have perceived inequities in application of the broader joint enterprise doctrine. Indeed, there is not the same reason for imposing liability in the non-commercial situations which are more often matters of friendly or family cooperation and accommodation.

While the broader definition of joint enterprise has been previously embraced by this Court, we have determined that the definition set forth in the Restatement § 491, comment c is better reasoned and is adopted. By limiting the application of the doctrine to an enterprise having a business or pecuniary purpose, we will henceforth be avoiding the imposition of a basically commercial concept upon relationships not having this characteristic.[36]

Although we considered the concept of joint enterprise liability in several cases after *Shoemaker*, we have not altered Shoemaker's adoption of the Restatement definition of joint enterprise. Nor have we changed its holding requiring as an element of joint enterprise that there exist a community of pecuniary interest in the common purpose to be carried out by the members of the group.[37] Thus, the third element of a joint enterprise is, and has been since *Shoemaker*, whether there is "a community of pecuniary interest in [the common purpose of the enterprise], among the members [of the group]."[38]

■ The court of appeals held that the trial court properly defined joint enter-

---

**36.** *Id.*

**37.** In *Triplex Communications, Inc. v. Riley,* we referred to the third element of a joint enterprise as "a common pecuniary interest." 900 S.W.2d 716, 718 (Tex.1995) (quoting *Shoemaker,* 513 S.W.2d at 16–17). And in *Blount v. Bordens, Inc.,* we referred to the third element as "a community of pecuniary interest." 910 S.W.2d 931, 933 (Tex.1995) (per curiam) (citing *Triplex,* 900 S.W.2d at 718). However, both references were in the context of a cursory recitation of all four elements of a joint enterprise, with no indication that we were changing any of those elements from the language set forth in the Restatement and expressly adopted in *Shoemaker.* As such, the language in *Triplex* and *Blount* must be recognized merely as shorthand renditions of the elements of a joint enterprise, not a revision of the Restatement formulation. Moreover, in *Texas Department of Transportation v. Able,* we recited the elements of a joint enterprise by quoting directly from *Shoemaker* and the Restatement. 35 S.W.3d 608, 613 (Tex.2000).

**38.** *Shoemaker,* 513 S.W.2d at 16–17.

prise in charging the jury,[39] recognizing that we adopted the Restatement language in *Shoemaker*. The court of appeals, however, held that the Restatement language and the language in the charge mean the same thing:

[T]he *Shoemaker* court approved the language of the Restatement, "a community of pecuniary interest in [the common purpose of the enterprise], among the members," but then noted that this only meant that the enterprise have a "common business or pecuniary purpose."[40]

We disagree with the court of appeals' characterization of the language in *Shoemaker* as well as its conclusion that the third element of the Restatement's definition has the same meaning as the definition used in the charge.

In *Shoemaker*, we expressly adopted the Restatement definition of joint enterprise in the context of deciding whether to limit joint enterprise vicarious liability to the business or commercial context.[41] Before adopting the Restatement's formulation, we considered several alternative wordings for that restriction, including " 'common business purpose,' a 'common financial interest,' a 'common pecuniary objective,' or a 'venture for profit in a financial or commercial sense.' "[42] Although in *Shoemaker* we referred to our adoption of the Restatement's definition as "limiting the application of the doctrine to an enterprise having a business or pecuniary purpose,"[43] this statement was made in the context of limiting the joint enterprise theory to commercial as opposed to personal transactions. It did not modify the Restatement language that we expressly adopted to define joint enterprise.

Comparing the charge's language ("common business or pecuniary interest") with the Restatement's language (a "community of pecuniary interest in [the common] purpose, among the members [of the group]") confirms that the two phrases do not have the same meaning. Moreover, the charge's wording is in the disjunctive, which would permit the jury to find that the third element of the joint enterprise test was met after finding either a "common business interest" or a "common pecuniary interest."

Parties to an agreement may have a "common business interest," "a common pecuniary interest," or both, despite lacking a community of pecuniary interest in the purpose of their agreement. For example, both a franchisor and its franchisee may be said to have a common business and pecuniary interest in the retail marketing or sales of the franchised product or service. The franchisee benefits from receiving the income and any resulting profits generated by its sales and by the market value of his or her franchise resulting from its profitability. The franchisor benefits by receiving royalty payments from its franchisee based on those sales and by the enhanced value accruing to its franchise opportunities resulting from the financial success of the existing franchises.

Similarly, wholesalers and retailers may also be said to have a common business or pecuniary interest in the retail marketing and sales of their products. Without retail demand for the product they distribute, neither the wholesaler nor the retailer will stay in business very long. And the same could also be said of a retailer's supplier—

39. 999 S.W.2d at 587.

40. *Id.* at 586.

41. 513 S.W.2d at 17.

42. *Id.*

43. *Id.*

both the baker and the owner of a hot dog stand benefit financially from the latter's hot dog sales—although the baker's benefit is indirect.

However, a franchisor, wholesaler, or supplier usually does not have a "community of pecuniary interest" in the retail sales of its respective franchisees, retailers, or customers. Although the former entities stand to benefit financially from the successful downstream marketing of their goods or services, their interests in those activities are not held in "community" with the members of the latter group because they are not shared "without special or distinguishing characteristics."[44]

In *Ely v. General Motors Corp.*, the Texarkana Court of Appeals recognized the "non-communal" nature of the pecuniary interests of entities at different levels of a distribution chain.[45] It held that the service and franchise agreements between an auto manufacturer and an auto dealer did not evidence the community of pecuniary interest required for a joint enterprise.[46]

■ Thus, whether parties have a "common business or pecuniary interest" (as the court's charge inquired) is not the same as whether they have a "community of pecuniary interest," as required by *Shoemaker* and the Restatement. Instructing the jury that it may find a joint enterprise based in part on a finding of a "common business or pecuniary interest" opens to vicarious liability parties who may

have business or pecuniary interests in the activities of others, but whose interests in those activities are not held in community with those others because they are not shared without special or distinguishing characteristics. This is contrary to the requirements of the Restatement and *Shoemaker*. Such a charge thus misstates Texas law regarding joint enterprise.

■ The trial court's definition of "joint enterprise" also has another shortcoming, which becomes more apparent when analyzing how the four elements of the Restatement's joint enterprise definition link together. The first two elements require an agreement and a common purpose to be carried out by the group.[47] The third element—"a community of pecuniary interest in *that purpose*, among the members"[48]—is referring to the same "common purpose" and "group" members referred to in the second element. Lastly, the fourth element requires the group members to have "an equal right to a voice in the direction of the enterprise, which gives an equal right of control."[49] Thus, the elements of the Restatement's definition interrelate and require all the parties to the proposed joint enterprise to: (1) agree to a common purpose; (2) have a community of pecuniary interest in *that* common purpose; and (3) have an equal right of control over the enterprise or project[50] formed to carry out that purpose.

This analysis appears prosaic, especially if the evidence of the parties' relationship

---

44. *Ely v. Gen. Motors Corp.*, 927 S.W.2d 774, 779 (Tex.App.-Texarkana 1996, writ denied) (citing Black's Law Dictionary 274 (6th ed.1990) (defining "common")).

45. *Id.*

46. *Id.*

47. Restatement (Second) of Torts § 491 cmt. c (1965).

48. *Id.* (emphasis added).

49. *Id.*

50. The ordinary definition of "enterprise" is "a project undertaken or to be undertaken ..." or "a plan for such a project." Webster's New Universal Unabridged Dictionary 648 (1996).

raises only the possibility of a single, discrete common purpose and agreement between them. For example, if the evidence showed two otherwise strangers agreed to travel together to a certain destination, the common purpose and the scope of any purported joint enterprise arising from their relationship would be undisputed, even if the parties disputed the existence of the other elements necessary for joint enterprise liability.

The importance of this observation becomes more apparent when, as in this case, the evidence shows a more complex, ongoing relationship between the members of the claimed joint enterprise. In such circumstances, the evidence may show several different agreements and understandings between the parties, encompassing an assortment of common purposes, and thus a number of possible projects or "enterprises" devoted to carrying them out. The parties may have a "community of pecuniary interest" (required by the Restatement's third element) in some of those purposes but not in others. Or, as to some of the putative enterprises but not others, the evidence may be equivocal or nonexistent as to whether the parties have an equal right to a voice in the enterprise's direction, giving an equal right of control as required by the Restatement's fourth element.

■ If the evidence shows several possible purposes and concomitant projects or enterprises to accomplish them, a properly worded charge must require the jury to find that the joint enterprise elements, particularly the "community of pecuniary interest in [the common] purpose" and "equal right of control" elements, exist with respect to the *same* concomitant purpose and enterprise. Otherwise, a jury could find a joint enterprise existed even if the evidence conclusively showed, for example, that with respect to two possible common purposes and their corresponding enterprises, there was no community of pecuniary interest in one, and no equal right of control in the other.

■ In this case, the trial court submitted a definition that did not require the purpose in which the parties have a community of pecuniary interest to be the same as the purpose of the enterprise or project over which the parties have an equal right of control. The trial court's definition misstates the law when, as here, there is evidence of an agreement encompassing a number of possible purposes and activities, a complex financial relationship related to those purposes, and a composite of rights and responsibilities concerning the control of the parties' endeavors.

Accordingly, we disagree with the court of appeals' conclusion that we held in *Shoemaker* that the Restatement definition means the same as the language used in the trial court's charge. We conclude the trial court's charge misstated the legal requirements for finding a joint enterprise by defining the third element of a joint enterprise as requiring a "common business or pecuniary interest" and not a "community of pecuniary interest in [the common] purpose, among the members [of the group]."[51] Because the court of ap-

---

**51.** The court of appeals also stated the district court's definition "actually narrowed or restricted the term 'pecuniary' to a business context." 999 S.W.2d at 586. It supported this conclusion by observing that Texas courts have used the word "pecuniary" broadly to mean financial or monetary matters and as "encompassing personal as well as business or commercial implications." *Id.* at 587. As an example, it stated: " 'Pecuniary benefits' encompass those benefits, including money, that can be reasonably estimated in money, such as labor, services, kindness and attention of a child to its parents." *Id.* (emphasis omitted) (quoting *Borak v. Bridge*, 524 S.W.2d 773, 776 (Tex.Civ.App.-Corpus Christi 1975, writ

peals erred when it found to the contrary, we sustain St. Joseph's issue in this regard.[52]

## B. Legal Sufficiency of the Evidence

St. Joseph also contends the evidence is legally insufficient to support the finding of joint enterprise. Before we can measure the sufficiency of the evidence we must first identify the standard against which the evidence is to be measured.

In *Osterberg v. Peca*, we considered whether we should measure the sufficiency of the evidence against the jury charge that was actually submitted, which the appellants claimed was defective, or against the charge that the trial court should have submitted, and we concluded that "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence *when the opposing party fails to object to the charge.*"[53]

■ But this case is different from *Osterberg* because St. Joseph properly preserved error by objecting to the joint enterprise definition used in the charge. Because the trial court submitted an erroneous definition of joint enterprise over a proper objection, we measure the legal sufficiency of the evidence supporting the jury's finding of joint enterprise against the Restatement's definition of joint enterprise as adopted in *Shoemaker*.[54] For convenience, we repeat the elements of that definition as follows:

> (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.[55]

With respect to the first element, the Program Contract is ample evidence of an agreement between St. Joseph and the Foundation. However, as discussed in connection with the definition of joint enterprise, evidence of an ongoing, complex relationship between two or more entities may well raise the possibility of a number of purposes (some common, others not), interests (both separate and common, pecuniary and non-pecuniary), agreements, and activities designed to fulfill those purposes, as well as a composite of rights and

ref'd n.r.e.)). It then concluded that the district court's definition "made it clear to the jury that it could find that St. Joseph and the Foundation were engaged in a joint enterprise only if it found that the nature of their endeavor was business or commercial, as opposed to personal in nature." *Id.* (emphasis omitted).

Because we do not agree that the term "pecuniary" is as broadly defined as the court of appeals stated, the court of appeals erred in holding that the charge narrowed the term's use to a business context. 999 S.W.2d at 586. Even applying the court of appeals' definition, however, the charge did not narrow or restrict the jury's consideration of the term "pecuniary" to a business context. To the extent "pecuniary" may be understood to encompass more than business or commercial situations, the charge's disjunctive phrasing of "business or pecuniary interest" would improperly allow a jury to find the element was proven even in the absence of a commercial or business arrangement.

**52.** In reaching this conclusion, we are aware that the trial court's definition of joint enterprise tracked the language set forth in the Texas Pattern Jury Charge. *See* Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges—General Negligence & Intentional Personal Torts PJC 7.11 (2000).

**53.** 12 S.W.3d 31, 55 (Tex.2000) (emphasis added).

**54.** *See id.*

**55.** *Shoemaker v. Estate of Whistler*, 513 S.W.2d 10, 16–17 (Tex.1974) (citing Restatement (Second) of Torts § 491 (1965)).

responsibilities concerning the control of those activities.

An enterprise or project is most commonly defined by the common purpose or goal of its members. The jury found a joint enterprise existed between St. Joseph and the Foundation, but the charge did not define the phrase "common purpose" or the "enterprise" concomitant with that purpose. If possible, however, we must interpret the jury's findings in a manner to uphold the judgment.[56] Thus, we look first to the evidence of the agreement or agreements between St. Joseph and the Foundation to ascertain their possible "common purposes," and then we consider if the evidence is legally sufficient to support the finding of a joint enterprise with respect to each possible common purpose evidenced by their agreements.

### 1. General Surgery Residency Program

■ We need not go into detail to conclude the record contains the requisite evidence that St. Joseph and the Foundation had an agreement and a common purpose to establish a general surgery residency program at Brackenridge Hospital. The Program Contract recites that St. Joseph and the Foundation sought to operate "an Integrated General Surgery Residency Program at Brackenridge Hospital, as an integral division of St. Joseph['s] ... General Surgery Residency Program...." Even if the parties had not expressly recited this common purpose, the terms of the Program Contract make it clear this was a common purpose of the two parties.

We now look to see whether there is more than a scintilla of evidence that St. Joseph and the Foundation had a community of pecuniary interest in that purpose,[57] i.e. the purpose of operating the general surgery residency program at Brackenridge Hospital. We conclude there is no such evidence.

■ The ordinary meaning of "pecuniary" is "of or pertaining to money."[58] Thus, to satisfy the third element of the Restatement definition an interest must first be monetary in nature. And again, that monetary interest must be common among the members of the group—it must be one "shared without special or distinguishing characteristics."[59]

There is no evidence in the record that St. Joseph agreed to share with the Foundation any money it received from operating the general surgery residency program. Although St. Joseph received Medicare funds based on the number of residents in the program, there is no evidence the Foundation shared in those funds. Similarly, there is no evidence the Foundation agreed to share with St. Joseph any money it received from operating the residency program. The evidence is undisputed that the Foundation contracted with the City of Austin to treat patients, using medical residents and others, at Brackenridge Hospital and other Austin

---

56. *Jackson v. U.S. Fid. & Guar. Co.*, 689 S.W.2d 408, 412 (Tex.1985); *Otis Spunkmeyer, Inc. v. Blakely*, 30 S.W.3d 678, 685 (Tex. App.-Dallas 2000, no pet.) (defining "occurrence in question" in a manner supporting the jury's finding under the evidence).

57. *See Shoemaker*, 513 S.W.2d at 16–17.

58. WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1428 (1996). Other alternative defini-

tions include: "2. Consisting of or given or exacted in money or monetary payments: *pecuniary tributes.* 3. (of a crime, violation, etc.) involving a money penalty or fine...." *Id.*

59. *Ely v. Gen. Motors Corp.*, 927 S.W.2d 774, 779 (Tex.App.-Texarkana 1996, writ denied) (citing BLACK'S LAW DICTIONARY 274 (6th ed.1990) (defining "common")).

locations. In return, the Foundation received certain payments from the City of Austin. The Foundation also retained the right to bill patients (except MAP Patients), government assistance programs, and third-party payors (as applicable) for the services provided by its physicians, including the general surgery residents, and to collect on those bills. It is undisputed the resulting income belonged to the Foundation and was not shared with St. Joseph. Although the Foundation reimbursed St. Joseph for the salaries and benefits paid to the general surgery residents while they were on rotation at Brackenridge Hospital in Austin, there is no evidence this obligation depended on the Foundation's receipt of any fees generated by the residents or was payable solely from that source of income.

The Wolffs argue that both St. Joseph and the Foundation benefitted financially from the residency program.[60] Their brief first states that without the Foundation, "St. Joseph could not have an accredited surgical residency program, making the most obvious benefit the program's very existence." However, the record references the Wolffs cite in their brief do not support this statement. Rather, these cited portions of the record make clear that it was the Foundation that could not have participated in a general surgery residency program without St. Joseph's involvement. There is also evidence St. Joseph could have operated an accredited residency program by affiliating with institutions other than the Foundation and had previously obtained surgical experience for its residents by working with other hospitals in Houston.

Moreover, the existence of monetary benefits flowing from the program does not by itself satisfy the third element of a joint enterprise. There must still be evidence that the monetary benefits were shared among the members without special or distinguishing characteristics, and there is no evidence of such an arrangement here.

The Wolffs also point to evidence that sponsoring a residency program enhances an institution's stature in the medical community and that institutions involved in residency training have an opportunity to recruit residents to stay and practice in their communities after they finish their training. To the extent that there is evidence that St. Joseph and the Foundation actually received these benefits, as opposed to evidence that these are the types of benefits that generally accrue from operating a residency program, these benefits are nonetheless non-pecuniary in nature because they do not constitute monetary interests resulting from the operation of the residency program.

Moreover, these types of indirect, potential financial interests are similar to the indirect, potential financial interests of the franchisor, wholesaler, or supplier concerning the success of their respective franchisees, retailers, or customers. If such interests are sufficient to constitute a "community of pecuniary interest in [the common] purpose," the possibility of joint enterprise vicarious liability would be extended to relationships and situations far beyond those considered in our prior cases and those envisioned and discussed in the Restatement.

The Wolffs also point to evidence that physicians are drawn to hospitals that

---

**60.** The Wolffs' brief argues the evidence is legally sufficient to support the finding of a "common business or pecuniary purpose," which was how the court's charge defined this element of joint enterprise. As discussed earlier, this is not the standard against which we review the sufficiency of the evidence.

have residents available to assist with patient care at lower rates, thereby benefitting the hospitals. This interest is similar to the indirect, potential financial interests described above and is not sufficient to satisfy the Restatement's third element of a joint enterprise. Even if this interest were considered pecuniary in nature, it is not one common to both St. Joseph and the Foundation. The Foundation is not a hospital, but an organization of physicians set up to operate this and other residency programs in Austin.

This case is unlike *Texas Department of Transportation v. Able,*[61] in which this Court held there was evidence to support a finding that a joint enterprise existed between a state agency—the Texas Department of Transportation ("TxDOT")—and a local transit authority—Houston Metropolitan Transit Authority ("Metro").[62] The opinion in *Able* recited that the evidence included documents explaining the joint nature of TxDOT's and Metro's financial undertakings with respect to the construction and operation of the high occupancy vehicle lane involved in the case and stated that the documents "clearly contemplate an economic gain that could be realized by undertaking the activities in [the manner they contracted]."[63] By contrast, this case contains no evidence that either St. Joseph or the Foundation agreed to share with each other any financial benefits resulting from the operation of the general surgery residency program as a whole, the program's operations at Brackenridge, or Wolff's treatment.

 The Wolffs next argue that the "community of pecuniary interest" requirement is met because St. Joseph and the Foundation shared costs related to the program, citing as examples evidence that they both contributed personnel and services and the Foundation reimbursed St. Joseph for the costs of the stipends paid to the residents who were on rotation at Brackenridge Hospital. The Restatement, however, requires the members of a joint enterprise to have a community of pecuniary interest in the common purpose or goal of the enterprise, not the means by which that purpose or goal is achieved. Like the co-owners who purchased the search plane that crashed in *Shoemaker*, St. Joseph and the Foundation may have both spent money in connection with the residency program. The investment of time and money to fulfill a common purpose, however, does not render that purpose "pecuniary" in nature. Rather, such an expenditure may be evidence of a common purpose or a joint right of control concerning the project or enterprise undertaken to accomplish that purpose. It does not, however, invest a non-pecuniary purpose with a pecuniary nature. Were it otherwise, an agreement to share the costs of accomplishing a common—though non-pecuniary—purpose, such as taking a shared vacation or jointly purchasing a boat for recreational purposes, would render that purpose pecuniary in nature and, thus, sufficient to meet the third element of the Restatement's joint enterprise definition.

 Additionally, sharing the costs of accomplishing a common purpose does not render the parties' respective interests in that purpose "community" in nature. There still must be some evidence that the parties shared or held in community a pecuniary interest in the relevant common purpose. We have already detailed the evidence that negates any notion that St.

**61.** 35 S.W.3d 608 (Tex.2000).

**62.** *Id.* at 616.

**63.** *Id.* at 614.

Joseph and the Foundation had a "community" of pecuniary interest in the residency program. Accordingly, we conclude that there is no more than a scintilla of evidence of a community of pecuniary interest between St. Joseph and the Foundation in the operation of the surgical residency program at Brackenridge Hospital. Because this precludes a finding of joint enterprise with respect to this common purpose, we need not consider whether there is evidence of the other elements of such a joint enterprise.

### 2. General Patient Care at Brackenridge

There is evidence that providing medical care to patients is an integral part of a medical residency program. Thus, looking at the Program Contract with a narrower focus, the jury might have found that it evidenced a common purpose between St. Joseph and the Foundation to provide patient care at Brackenridge Hospital. Because we must uphold the jury's determination of joint enterprise if it is supported by the evidence, we examine the evidence of a joint enterprise with respect to this possible common purpose as well.

However, as discussed in connection with the operation of the residency program at Brackenridge, there is no evidence of a community of pecuniary interest between St. Joseph and the Foundation with respect to the provision of patient care at Brackenridge. We do not recount that evidence in detail again, but the most critical evidence is that the parties did not share any income from the residency program's operations at Brackenridge. The Foundation billed for the residents' services at Brackenridge and kept all of the revenue; St. Joseph received none of it.

Thus, we conclude that there is no more than a scintilla of evidence of a community of pecuniary interest between St. Joseph and the Foundation in providing patient care at Brackenridge Hospital. Because this holding precludes a finding of joint enterprise with respect to this possible common purpose, we need not consider whether there is evidence of the other elements of such a joint enterprise.

### 3. Wolff's Care

We also consider whether St. Joseph and the Foundation had a common purpose of providing patient care specifically to Stacy Wolff. In addition to the complete lack of evidence of a community of pecuniary interest with respect to Wolff's care, there is no evidence St. Joseph was aware of Wolff's presence as a patient at Brackenridge, much less that St. Joseph and the Foundation had an agreement and common purpose specifically with regard to Wolff's treatment.

### 4. Conclusion

One of the elements of a joint enterprise in Texas is that there must be a "community of pecuniary interest in [the common] purpose [of the enterprise], among its members." [64] There is no evidence of such an interest in any of the possible common purposes between St. Joseph and the Foundation raised by the evidence. Thus, rather than remand this theory of recovery to the trial court to be retried using the appropriate jury instructions, we render judgment that the Wolffs take nothing against St. Joseph under a joint enterprise theory.

### IV. JOINT VENTURE

In response to Question No. 4, the jury found St. Joseph and the Foundation

---

**64.** *Shoemaker v. Estate of Whistler,* 513 S.W.2d 10, 16–17 (Tex.1974).

were engaged in a joint venture. They were instructed that a joint venture exists "if the persons or entities concerned have (1) a community of interest in the venture; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of control or management of the venture." Accordingly, if there is no evidence of any one of these four elements, we cannot sustain the jury's finding of a joint venture.[65]

St. Joseph contends there is no evidence of an agreement between it and the Foundation to share monetary profits or losses. In response, the Wolffs do not point to any such evidence, and applying the appropriate standard of review, we have found none. The Wolffs, however, cite our opinion in *Porter v. Puryear* and argue that the shared profits and losses necessary to support the existence of a joint venture need not be directly monetary in nature.[66]

*Porter* involved a claimed joint venture between two physicians, Dr. Finer, who was a surgical resident at a hospital, and Dr. Porter, who owned the hospital. Finer agreed to perform surgery on a patient, and Porter agreed to furnish hospital and surgical facilities and an anesthetist's services. Upon the completion of the surgery, Porter would charge the patient a fixed fee, to be divided between the two of them. Although this arrangement clearly evidenced an agreement to share profits, Porter argued there was no evidence of an agreement to share losses, and thus he could not be liable as a joint venturer with Finer for medical malpractice.[67]

We held that the fact that Finer was not responsible for a share of the hospital expenses and attendants' salaries did not mean that he shared no part of the losses:

If the fee was paid, both would share in the compensation arising out of the venture. If it was not paid, both would share in the losses—Dr. Porter would lose the value of the use of his facilities and employees' services and Dr. Finer would lose the value of his services, time and labor. The arrangement was not unlike any joint venture to which one party contributes the capital and the other contributes his services.[68]

Based on *Porter*, the Wolffs' position is that if the surgery residency program failed, St. Joseph and the Foundation would lose the value of their respective investments of services, time, and employee labor. The Wolffs argue that evidence of such an arrangement constitutes some evidence of an agreement to share losses and supports the jury's finding that St. Joseph and the Foundation were engaged in a joint venture.

We need not reach whether evidence of an arrangement like the one discussed in *Porter* constitutes evidence of "an express agreement to share losses" necessary to establish a joint venture because, unlike *Porter*, the record in this case is devoid of any evidence that St. Joseph and the Foundation agreed to *share profits*. We previously detailed the evidence concerning the parties' financial relationship and summarize it here only by stating that there is no evidence St. Joseph and the Foundation agreed to share income (much less profits) received from any source, including the operation of the general surgery residency program.

In reviewing the record with respect to the jury's finding of "joint enterprise," we

---

65. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex.1997).

66. 153 Tex. 82, 262 S.W.2d 933, 938 (1953).

67. *Id.*

68. *Id.*

considered all possible common purposes raised by the evidence. However, here we need not search for possible alternative "ventures" in support of the jury's answer to Question No. 4. Regardless of how the jury could have defined "venture" under the evidence, the complete absence of any evidence that St. Joseph and the Foundation agreed to share profits is fatal to the Wolffs' joint venture theory. Because there is no evidence to support the jury's answer to Question No. 4, the Wolffs' judgment against St. Joseph cannot stand on the joint venture theory of vicarious liability.

## V. RATIFICATION

■ The trial court instructed the jury that ratification may be express or implied and that implied ratification occurs if:

a party, though he may have been unaware of unauthorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction.

The jury found Villafani's conduct had been ratified by St. Joseph, the Foundation, and a joint venture between St. Joseph and the Foundation. St. Joseph contends there is no evidence to support these findings.

We have already concluded there is no evidence to support the finding that a joint venture existed between St. Joseph and the Foundation and, therefore, necessarily conclude there is no evidence to support the jury's finding that such a joint venture ratified Villafani's conduct. We now ad-

dress whether the record contains any evidence that St. Joseph ratified Villafani's actions.

■ Even if a principal was unaware of its agent's unauthorized action, it may ratify that action and thus become liable for it if the principal retains the benefits of the action after acquiring full knowledge of the unauthorized conduct.[69] Turning to the record, we conclude there is no evidence St. Joseph expressly ratified Villafani's conduct in treating Wolff, or that it impliedly ratified Villafani's conduct by receiving and retaining any benefits that may have resulted from Villafani's treatment of Wolff. Indeed, it is difficult to imagine what those benefits could be. There is no evidence St. Joseph received or was entitled to receive any portion of any fees from Villafani's treatment of Wolff or any other patient at Brackenridge. In fact, the evidence is undisputed that any fees relating to Villafani's treatment of Wolff belonged to the Foundation, not St. Joseph.

The Wolffs state that the record is "replete with evidence that St. Joseph retained the benefits" of Villafani's participation in the program. However, their brief only references evidence of benefits pertaining to the conduct of a residency program generally and none specific to Villafani's treatment of Wolff while he was a resident in that program. In fact, the only evidence cited by the Wolffs with regard to Villafani is that St. Joseph signed new contracts with Villafani for the fourth and fifth years of his residency and ultimately signed off on the quality of his performance at the end of his residency to allow Villafani to apply for board certification in surgery. This is no evidence of ratification.[70]

---

**69.** *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.,* 609 S.W.2d 754, 756 (Tex.1980).

**70.** *See Wal–Mart Stores, Inc. v. Odem,* 929 S.W.2d 513, 530 (Tex.App.-San Antonio 1996,

Beyond that, there is no evidence to support a finding that Villafani's conduct in treating Wolff was "taken on [St. Joseph's] behalf." Villafani treated Wolff at Brackenridge Hospital in Austin. His activities were at best taken on behalf of the Foundation, which supervised Villafani's treatment of Wolff and was entitled to compensation for that treatment. The fact that Villafani was in St. Joseph's residency program at the time he treated Wolff does not necessarily mean his actions were "taken on St. Joseph's behalf."

Because the record contains no evidence to support the jury's finding that St. Joseph ratified Villafani's conduct, we conclude any liability for damages resulting from that conduct cannot be imputed to St. Joseph on the basis of ratification.

## VI. "MISSION"

 The jury also found that Villafani was "providing patient care to Stacy Wolff in the furtherance of a mission for the benefit of [St. Joseph] and subject to control by that same entity as to the details of the mission." The question the jury answered generally tracks the Texas Pattern Jury Charge's language for respondeat superior liability outside the employment context.[71] The key elements of such a theory are (1) benefit to the defendant and (2) right of control.[72]

For the reasons we explained in connection with the issue of ratification, Villafani's treatment of Wolff while he was in St. Joseph's residency program is not of itself

any evidence that he treated her for St. Joseph's benefit. Because there is no evidence that St. Joseph benefitted or could have benefitted from Wolff's treatment, there is no evidence to support the jury's finding that Villafani's treatment of Wolff was in furtherance of a mission for the benefit of St. Joseph.

## VII. EMPLOYMENT AND BORROWED EMPLOYEE

### A. Introduction

 This Court has long recognized that a general or regular employee of one employer may become the borrowed employee of another with respect to some activities.[73] Whether this has in fact occurred hinges on whether the other employer or its agents have the right to direct and control the employee with respect to the details of the particular work at issue. The instruction in the Texas Pattern Jury Charge (which St. Joseph tracked in its requested instruction) generally summarizes the principle:

An employee ceases to be an employee of his general employer if he becomes the "borrowed employee" of another. One who would otherwise be in the general employment of one employer is a borrowed employee of another employer if such other employer or his agents have the right to direct and control the details of the particular work inquired about.[74]

---

writ denied) (failure to discharge does not amount to ratification).

**71.** *See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—GENERAL NEGLIGENCE & INTENTIONAL PERSONAL TORTS PJC 7.10 (2000).

**72.** *Id.; see also English v. Dhane,* 156 Tex. 231, 294 S.W.2d 709, 711 (1956); *Bertrand v.*

*Mutual Motor Co.,* 38 S.W.2d 417, 418 (Tex. Civ.App.-Eastland 1931, writ ref'd).

**73.** *Sparger v. Worley Hosp., Inc.,* 547 S.W.2d 582, 583 (Tex.1977); *Producers Chem. Co. v. McKay,* 366 S.W.2d 220, 225 (Tex.1963).

**74.** COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES & PRODUCTS PJC 52.2 (1997).

If an employee of one becomes the borrowed employee of another, he is no longer considered an employee of the general employer for vicarious liability purposes.[75]

St. Joseph pleaded that Villafani was acting as the Foundation's borrowed employee when he treated Wolff. At the close of evidence, St. Joseph moved for an instructed verdict asserting, in part, that to the extent Villafani might be considered its employee he "[was], as a matter of law, a borrowed servant and subject to the right of control of other persons or entities." The trial court overruled the motion.

At the close of evidence, the trial court prepared a charge inquiring whether Villafani was acting as an employee of St. Joseph, the Foundation, and/or a joint venture between them. In connection with those issues, the charge instructed the jury that:

An "employee" is a person in the service of another with the understanding, express or implied, that such other person has the *right to direct the details of the work* and not merely the results to be accomplished.

A person is not acting as an employee if he is acting as an independent contractor. An "independent contractor" is a person who, in pursuit of an independent business, undertakes to do specific work for another person, using his own means and methods *without submitting himself to the control of such other person with respect to the details of the work,* and who represents the will of such other person only as to the result

of his work and not as to the means by which it is accomplished.

A person may be the employee of more than one employer.[76]

St. Joseph timely requested in writing and in substantially correct form an instruction on the law concerning a borrowed employee. The trial court refused St. Joseph's request and did not instruct the jury on borrowed employee. The jury found that, on the occasion in question, Villafani was acting as an employee of St. Joseph, the Foundation, and a joint venture between them.[77]

Thereafter, St. Joseph moved for a judgment notwithstanding the verdict, asserting among other things that, as a matter of law, Villafani was "the borrowed servant and subject to the right of control of other persons with respect to Stacy Wolff's medical care." The trial court, however, rendered judgment on the jury's verdict.

In the court of appeals, St. Joseph argued the evidence showed it had no control over the details of Villafani's medical treatment of Wolff at Brackenridge, and that even if Villafani was its general employee, he was acting as the Foundation's borrowed employee when he treated Wolff. At the very least, St. Joseph complained, the evidence raised a fact issue on borrowed servant requiring the submission of its requested instruction. The court of appeals concluded any error in the trial court's refusal to submit the instruction was rendered harmless by the jury's joint enterprise finding, which it upheld.[78] Thus, the court of appeals did not reach the issue of whether Villafani was acting as

**75.** *See Starnes v. United States,* 139 F.3d 540, 542 (5th Cir.1998) (applying Texas law) ("Respondeat superior liability is assigned to the borrowing employer who had control over the act in question.").

**76.** Emphasis added.

**77.** The jury also found Villafani was acting in the scope of his employment with those three entities.

**78.** 999 S.W.2d at 592.

the Foundation's borrowed employee as a matter of law.[79]

Here, St. Joseph contends there is no evidence to support the jury's findings that Villafani was St. Joseph's general or regular employee or an employee of a joint venture composed of St. Joseph and the Foundation. As there is no evidence to support the finding that a joint venture existed between St. Joseph and the Foundation, the jury's finding that Villafani was an employee of that joint venture fails. We have already held there is no evidence of a joint enterprise between St. Joseph and the Foundation. Thus, St. Joseph cannot be held vicariously liable for Villafani's negligence based on the theory that it was part of a joint enterprise with the Foundation, which undisputedly was an employer of Villafani,[80] and we are left with the jury's finding that Villafani was St. Joseph's employee when he negligently treated Wolff.

St. Joseph attacks this finding in several ways. First, St. Joseph and several amici argue that it was legally impossible for St. Joseph to be Villafani's employer because of statutory restrictions on the ability of corporations to practice medicine. Second, it contends there is no evidence Villafani was its employee when he treated Wolff because there is no evidence that St. Joseph had the right to direct the details of Villafani's work while he was on rotation with the Foundation at Brackenridge Hospital. To the contrary, St. Joseph argues the undisputed evidence establishes con-

clusively, or as a matter of law, that Villafani was acting as the Foundation's borrowed employee when he treated Wolff.[81]

## B. Corporate Practice of Medicine

■ We first address the legal argument that St. Joseph cannot be vicariously liable as an employer for Villafani's conduct because of Texas law concerning the corporate practice of medicine. St. Joseph and several amici [82] argue that, because a corporation cannot be licensed to practice medicine in Texas, incorporated hospitals like St. Joseph cannot "direct the details of work" of a physician engaged in the practice of medicine; thus, they cannot be vicariously liable as an employer for a physician's malpractice.

St. Joseph and the amici rely on several cases in support of this argument, but we decline to recount them in detail. We reject the legal argument, however, because it does not recognize the distinction between prohibition and prevention. The law may prohibit the corporate practice of medicine, but it does not render such activity a factual impossibility.

A statute prohibiting an incorporated hospital from employing a physician does not prevent the parties from factually accomplishing that very act in violation of the law any more than a statute prohibiting a crime makes the crime factually impossible to commit. Regardless of whether it was proper for Villafani to be St. Joseph's employee, if he in fact was so

79. *Id.*

80. Again, the Foundation is not a party to this appeal, and the parties do not dispute that Villafani was acting as an employee of the Foundation and in the scope of that employment when he treated Wolff.

81. St. Joseph also argues the trial court's failure to instruct the jury concerning a borrowed employee was error and was not harm-

less and that the court of appeals erred in concluding to the contrary.

82. The Children's Medical Center of Dallas, Baylor University Medical Center, the Texas Hospital Association, Memorial Hermann Hospital System, and the Central Texas Medical Foundation submitted amicus briefs on this issue.

when he treated Wolff, then as his employer St. Joseph is vicariously liable for his actions unless, as discussed below, Villafani was the Foundation's borrowed servant. As recognized in the Restatement (Second) of Agency:

> The fact that the state regulates the conduct of an employee through the operation of statutes requiring licenses or specific acts to be done or not to be done does not prevent the employer from having such control over the employee as to constitute him a servant.[83]

Thus, we conclude that Texas law concerning the corporate practice of medicine does not render Villafani's employment by St. Joseph a factual impossibility.

We now turn to St. Joseph's argument that: (1) there was no evidence that Villafani was an employee when he treated Wolff; and (2) the evidence established conclusively, or as a matter of law, that Villafani was acting as the Foundation's borrowed employee. Before we address these arguments, we recount the importance of the element of control as a justification for imposing vicarious liability.

## C. Right of Control

The common law has long recognized that liability for one person's fault may be imputed to another who is himself entirely without fault solely because of the relationship between them.[84] However, the concept of vicarious liability has resisted determined efforts to explain its basis or to precisely define its reach. Professors Prosser and Keeton set forth in their work on tort law a succinct summary of the principal justifications for imposing vicarious liability under modern-day common law:

A multitude of very ingenious reasons have been offered for the vicarious liability of a master: he has a more or less fictitious "control" over the behavior of the servant; he has "set the whole thing in motion," and is therefore responsible for what has happened; he has selected the servant and trusted him, and so should suffer for his wrongs, rather than an innocent stranger who has had no opportunity to protect himself; it is a great concession that any man should be permitted to employ another at all, and there should be a corresponding responsibility as the price to be paid for it—or, more frankly and cynically, "In hard fact, the reason for the employers' liability is the damages are taken from a deep pocket." None of these reasons is so self-sufficient as to carry conviction, although they are all in accord with the general common law notion that one who is in a position to exercise some general control over the situation must exercise it or bear the loss . . . .

*What has emerged as the modern justification for vicarious liability is a rule of policy, a deliberate allocation of a risk.* The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it, *it is just* that he, rather than the innocent injured plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or

---

**83.** Restatement (Second) of Agency § 220 cmt. i (1958).

**84.** *See id.* § 218 introductory note, § 219 cmt. a; Keeton et al., Prosser and Keeton on the Law of Torts § 69, at 499–501 (5th ed.1984).

liability insurance, to the public, and so to shift them to society, to the community at large.[85]

In *Dutcher v. Owens*, this Court expressly recognized that "[t]he theories of vicarious and joint and several liability are *judicially created vehicles* for enforcing remedies for wrongs committed. Justified on *public policy grounds*, they represent a deliberate allocation of risk." [86] Thus, as described by Prosser and Keeton, and as we recognized in *Dutcher*, the scope and extent of vicarious liability under the common law is clearly a policy determination—pure although not necessarily simple.

■ The above discussion makes clear there are a number of factors affecting whether and when vicarious liability is appropriate. Paramount among those factors, however, is whether the person being held responsible can be said to have had a right to control the activities of the wrongdoer. This is best illustrated by the imposition of vicarious liability in the context of the employer-employee or master-servant context. The Restatement (Second) of Agency recognizes the historical importance of control in justifying the imposition of liability for the actions of another:

> The conception of the master's liability to third persons appears to be an outgrowth of the idea that within the time of service, the master can exercise control over the physical activities of the servant. From this, the idea of responsibility for the harm done by the servant's activities followed naturally. The assumption of control is a usual basis for imposing tort liability when the thing controlled causes harm. It is true that normally one in control of tangible

things is not liable without fault. But in the law of master and servant the use of the fiction that "the act of the servant is the act of the master" has made it seem fair to subject the non-faulty employer to liability for the negligent and other faulty conduct of his servants.[87]

Similarly, in *Newspapers, Inc. v. Love*, we acknowledged that the master's right of control over his servant is the major factor governing whether to extend vicarious liability to cover a certain fact situation:

> The doctrine which holds the master liable for the torts of his servant committed in the course of his employment is essentially a policy doctrine and except for acts personally directed by the principal, the liability of the master is founded upon the contractual arrangement with the servant, either expressed or implied which vests in him the right to control the details of the work. Certainly if the right of control of details has a contractual basis, the circumstance that no actual control was exercised will not absolve the master of liability. Conversely, an occasional assertion of control should not destroy a settled relationship agreed to by the parties.[88]

Also, our 1998 decision in *Baptist Memorial Hospital System v. Sampson* succinctly sets forth the common law principle of respondeat superior and accurately expresses the importance of the "control" concept as a justification for imposing vicarious liability:

> Under the doctrine of respondeat superior, an employer is vicariously liable for the negligence of an agent or em-

---

85. KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 69, at 499–501 (emphasis added).

86. 647 S.W.2d 948, 950–51 (Tex.1983) (emphasis added).

87. RESTATEMENT (SECOND) OF AGENCY § 219 cmt. a.

88. 380 S.W.2d 582, 589 (Tex.1964) (citations omitted).

ployee acting within the scope of his or her agency or employment, although the principal or employer has not personally committed a wrong. The most frequently proffered justification for imposing such liability is that the principal or employer has the right to control the means and methods of the agent or employee's work. Because an independent contractor has sole control over the means and methods of the work to be accomplished, however, the individual or entity that hires the independent contractor is generally not vicariously liable for the tort or negligence of that person.[89]

We have even gone so far as to say that "the right to control remains the 'supreme test' for whether the master-servant relationship exists" and thus whether the rule of vicarious liability applies.[90]

 Therefore, in the employment context, it is the right of control that commonly justifies imposing liability on the employer for the actions of the employee. Indeed, it is the absence of that right of control that commonly distinguishes between an employee and an independent contractor and negates vicarious liability for the actions of the latter.[91] Similarly, it is the shift of the right to direct and control the details of the work that transforms a general employee of one employer into a borrowed employee of another, rendering the new employer vicariously liable for the borrowed employee's actions.

 In sum, whether a wrongdoer stands in such a close relation to another that it is just to hold the other person liable under the common law for damages resulting from the wrongdoer's actions is a public policy question. The answer to that question depends in very large part, though not exclusively, on whether the person sought to be liable—though not at fault himself—can be said to have such a degree of express or implied control over the actor to justify imposing on him the consequences of the actor's wrongful conduct.

## D. Employment and Control

 We now turn to whether the record supports the jury's finding that Villafani was St. Joseph's employee when he treated Wolff. St. Joseph argues there is no evidence that it had the degree of control required to support the jury's finding that Villafani was its employee. St. Joseph further argues the evidence proves conclusively, or as a matter of law, that Villafani was the Foundation's borrowed employee when he treated Wolff because he was subject to the Foundation's direction and control as to the details of his patient treatment while he was on rotation at Brackenridge Hospital.

Having reviewed the record, we conclude the evidence is undisputed that the Foundation or its agents had the right to direct and control the details of Villafani's medical treatment of Wolff. Thus, regardless of any evidence that Villafani was the general or regular employee of St. Joseph, he was acting as the borrowed employee of the Foundation as a matter of law when he treated Wolff.

---

**89.** 969 S.W.2d 945, 947 (Tex.1998) (citations omitted).

**90.** *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins,* 926 S.W.2d 287, 290 (Tex.1996).

**91.** *See Sampson,* 969 S.W.2d at 947. A party may be vicariously liable for his independent contractor's acts if he retains the "right to control the means, methods, or details of the independent contractor's work." *Id.* This exception further buttresses the conclusion that control is the principal factor supporting the imposition of vicarious liability.

As detailed above, ACGME required St. Joseph, as the sponsoring institution, to assume "final responsibility" for the residency program and for the educational quality of that program. Thus, St. Joseph, as the sponsoring hospital, had control over the residents' academic training and exercised that control in the context of setting the parameters of the residents' responsibilities at various stages in their residency experience. Similarly, St. Joseph set Villafani's rotation schedule and could limit the number and kind of patients he saw and the kinds of procedures he performed.

But with respect to the details of patient care at Brackenridge Hospital, St. Joseph's degree of control was quite different. As set forth earlier, the ACGME requirements unambiguously acknowledged and required residents such as Villafani to be supervised—foremost by the attending physician, but also by other, more senior residents. It is undisputed that while a resident was on rotation at Brackenridge, Harshaw, the Foundation's Director of Surgical Education under the Program Contract, was responsible for the residents through the Foundation's teaching staff, which Harshaw appointed subject to the approval of St. Joseph. As Director, Harshaw was also responsible for the residents' specific training assignments. If a resident did not meet the Foundation's standards, the Foundation could withdraw its approval of the resident and immediately suspend him or her from any activities at Brackenridge.

It is also undisputed that Paragraph G of the Program Contract provided that St. Joseph would "not control the details of the medical tasks performed by the residents when they are assigned to CTMF [the Foundation] save through consultation between and the mutual consent of the Academic Chief of General Surgery at St. Joseph Hospital and CTMF's Director of Surgical Education."

Finally, it is undisputed that Harshaw, the Foundation's Director of Surgical Education, was also Wolff's attending physician. It was he who assigned Villafani to assist him in providing Wolff's medical treatment and who was responsible for overseeing and directing the details of that treatment.

These undisputed facts establish conclusively, or as a matter of law, that Villafani was the Foundation's borrowed employee when he treated Wolff. Because the Foundation had the right to direct and control the details of Villafani's medical treatment of Wolff, St. Joseph cannot be vicariously liable as an employer for Villafani's actions.

The Wolffs argue that the "save through consultation and mutual consent" language in Paragraph G of the Program Contract contradicts the above evidence and supports the jury's finding that Villafani was acting as St. Joseph's employee. We disagree. Paragraph G makes it clear that St. Joseph in Houston had no direct control over "the details of the medical tasks performed by residents" while they were assigned to the Foundation and treating patients at Brackenridge in Austin. According to the evidence, that control belonged to either Wolff's attending physician, who was responsible for overseeing her care directly, or the Foundation's Director of Surgical Education, who was responsible (directly or indirectly, through the Foundation's teaching staff) for overseeing the residents' care of patients at Brackenridge. In Wolff's case, these two persons were the same—Harshaw.

The "save through consultation and mutual consent" clause does not change those facts or otherwise reestablish St. Joseph as an entity controlling the details of medical tasks performed by residents during

their rotation at Brackenridge. Rather, it confirms that St. Joseph's involvement in the details of those residents' administration of medical treatment at Brackenridge was indirect only and was limited to consulting about those issues with Harshaw, who had ultimate control over those tasks.

The dissent goes further than the Wolffs, contending that the Paragraph G language not only vested St. Joseph with control over the details of Villafani's medical treatment of Wolff, but also conclusively negated any possibility that Villafani was acting as the borrowed employee of the Foundation during that time. As noted above, we disagree with the dissent's reading of Paragraph G.[92]

\* \* \* \* \*

For these reasons, we reverse the judgment of the court of appeals and render judgment that the Wolffs take nothing against St. Joseph.[93]

Justice O'NEILL filed a concurring opinion, in which Chief Justice PHILLIPS joined.

Justice ENOCH filed a dissenting opinion, in which Justice HANKINSON joined.

Justice RODRIGUEZ and Justice SCHNEIDER did not participate in the decision.

Justice O'NEILL, concurring, joined by Chief Justice PHILLIPS.

Although I do not agree with all of the plurality's analysis, I concur in the judgment because I do not believe St. Joseph and the Foundation shared the requisite community of pecuniary interest in the residency program to establish a joint enterprise. I also believe that the Program Contract vested supervision and control of residents' patient care at Brackenridge with the Foundation's teaching staff, who in turn were under the supervision and control of the Foundation's Director of Surgical Education, Dr. Harshaw. Because teaching through patient care was the integrated residency program's primary purpose, and because control over this aspect of the program was allocated to the Foundation, the parties did not share an equal right of control in the enterprise's common purpose so as to impose joint enterprise liability. For this same reason, Dr. Villafani was the Foundation's borrowed servant as a matter of law. Finally,

---

**92.** Even the dissent's reading of Paragraph G would not support the judgment. Although a contractual assignment of the right of control can be dispositive of whether a regular employee of one party is a borrowed employee of another, it is not dispositive when there is conflicting evidence as to which entity had the right to control the details of the work in question. In such circumstances, the issue is left to the jury. *Exxon Corp. v. Perez,* 842 S.W.2d 629, 630 (Tex.1992). Thus, the dissent's reading of Paragraph G would mean only that a fact question existed as to whether Villafani was a borrowed employee of the Foundation and would require us to remand the case for a new trial on the Wolffs' employment theory of liability and St. Joseph's affirmative defense of borrowed employee. *See id.* ("[A] judgment cannot be permitted to

stand when a party is denied proper submission of a valid theory of recovery or a vital defensive issue raised by the pleadings and evidence.").

**93.** St. Joseph also complained the trial court erred in refusing to submit to the jury the negligence of John Thomas and Wallace Seggren, the two drivers involved in the accident that sent Wolff to Brackenridge Hospital. The court of appeals held that any such error was harmless because the trial court instructed the jury not to award damages for injury caused by the automobile accident. 999 S.W.2d at 594–95. Because of our disposition, we need not reach whether the trial court erred in refusing to submit the liability of the two drivers.

I do not believe Wolff is entitled to recover under the other liability theories asserted. For these reasons, I concur in the judgment.

Justice ENOCH filed a dissenting opinion, in which Justice HANKINSON joined.

St. Joseph Hospital is not only in the business of providing medical services, but also surgical training of medical residents. Dr. Mario Villafani was St. Joseph's surgical resident, stationed at Brackenridge Hospital, when Stacy Wolff was admitted to Brackenridge as a "teaching patient," and at which time, according to the jury, Dr. Villafani negligently treated Ms. Wolff. The only real question in this case is whether Dr. Villafani, as a medical doctor, can be an employee of St. Joseph such that St. Joseph would be vicariously liable for Dr. Villafani's negligence. Although my colleagues and I are unanimous that a doctor can be an employee of a hospital, and thus, the hospital can be vicariously liable for the doctor's negligence, six justices conclude that at the precise time Dr. Villafani was treating Ms. Wolff, he was the borrowed servant of the Central Texas Medical Foundation, and thus, St. Joseph was not vicariously liable for Dr. Villafani's negligence.

My colleagues' reasoning acknowledges that St. Joseph controlled what medical services its residents could perform. But they then conclude that St. Joseph didn't control those very medical services its resident, Dr. Villafani, performed. That is quite literally nonsense. Because I cannot join my colleagues' reasoning or the Court's judgment, I respectfully dissent.

With respect to whatever facts are in dispute, the plurality notes that the jury found that Dr. Villafani was the employee of both St. Joseph and the Medical Foundation and that he, when treating Ms. Wolff, was acting within the scope of his employment with each. From the extensive record, it is clear how the jury could find that Dr. Villafani worked for both St. Joseph and the Medical Foundation. What is not clear is how a majority of this Court could reach its conclusion, based on this same extensive record, that not only was Dr. Villafani not in the course and scope of his employment with St. Joseph when he treated Ms. Wolff, but also that he was the borrowed servant of the Medical Foundation as a matter of law.

My colleagues agree with me that "borrowed servant" is a doctrine that will relieve an employer from *respondeat superior* liability if the facts show that another employer had "borrowed" the employee when the act subjecting the employer to liability occurred.[1] This issue, then, turns on who had the right to control Dr. Villafani in his employment when Ms. Wolff was injured:

> Solution of the question rests in right of control of the manner in which the employees perform the services necessary to accomplishment of their ultimate obligation. If the general employees of one employer are placed under control of another employer in the manner of performing their services, they become his special or borrowed employees. If the employees remain under control of their general employer in the manner of performing their services, they remain employees of the general employer and he is liable for the consequences of their negligence.

. . .

When a contract, written or oral, between two employers expressly provides

---

1. *See Producers Chem. Co. v. McKay*, 366 S.W.2d 220, 225 (Tex.1963).

that one or the other shall have right of control, solution of the question is relatively simple.[2]

Where my colleagues' reasoning begins to get muddled is when it ignores that this doctrine, dependent on who exercises control, is governed by what the contract, if any, says about who has control over the employee.[3] St. Joseph apparently recognizes that contractual right-of-control can decide the borrowed-servant issue. It cites *Palmer v. Flaggman*,[4] a case from the United States Court of Appeals for the Fifth Circuit that applies Texas borrowed-servant law, and notes that the case held that "military residents were found to be borrowed servants of the hospital where they were working because the hospital had by contract the exclusive right to control the residents."

I agree that contractual right-to-control is sufficient to dispose of the borrowed-servant issue in this case. And here, St. Joseph contractually retained control of its medical residents, including Dr. Villafani. Consequently, Dr. Villafani could not be the Medical Foundation's "borrowed servant." As a result, St. Joseph should be liable for Dr. Villafani's negligence.

It is undisputed in this case that St. Joseph provides a surgical residency program for doctors. To be an accredited residency program, the Accreditation Council for Continuing Medical Education ("Council") requires that St. Joseph, as the sponsoring institution, "assume[ ] final responsibility for a program of graduate medical education."[5] The Council regulations state that "[t]he training of residents relies primarily on learning acquired through the process of their providing patient care under supervision."[6] In particular, surgical skills are learned by treating patients: "[o]perative skill is essential for the surgeon and can be acquired only through personal experience and training. The program must provide for sufficient operative experience to train qualified surgeons, taking into account individual capability and rate of progress."[7] To supply this operative training, an accredited residency program "must provide experience in preoperative, operative, and postoperative care for patients in all areas that constitute the principal components of general surgery."[8]

The Council requires that St. Joseph: "1) appoint[ ] the members of the teaching staff at the integrated institution; 2) appoint[ ] the chief or director of the teaching service in the integrated institution; 3) appoint[ ] all residents in the program; and 4) determine[ ] all rotations and assignments of both residents and members of the teaching staff."[9] Furthermore, all residents, even the most senior residents, must be supervised.[10] As well, the regulations require St. Joseph to provide an attending physician—someone to delegate all responsibility with regard to a patient—for each patient that a St. Joseph's resident is treating.[11]

---

2. *Id.* at 225–26; *see Carr v. Carroll Co.,* 646 S.W.2d 561, 565 (Tex.App.-Dallas 1982, writ ref'd n.r.e.).

3. *Producers Chem. Co.,* 366 S.W.2d at 226.

4. 93 F.3d 196 (5th Cir.1996).

5. AMERICAN MEDICAL ASSOCIATION, 1993–94 GRADUATE MEDICAL EDUCATION DIRECTORY 11 (1993).

6. *Id.* at 9.

7. *Id.* at 138.

8. *Id.* at 137.

9. *Id.* at 140.

10. *Id.*

11. *Id.*

Furthermore, St. Joseph agreed in its Integrated Program contract with the Medical Foundation that the residency program would follow the Council's regulations. The express agreement between the parties follows the Council's regulations and, as required for St. Joseph's accreditation as a surgical residency program provider, expressly states that St. Joseph retains actual control over Dr. Villafani's residency education. St. Joseph contractually retained the right to tell residents what patients to see, what procedures they could perform, what hours to work, in what city to work, and to whom to report while at work. St. Joseph retained the right to control almost every aspect of Dr. Villafani's work while he was a medical resident. Dr. Villafani, as all St. Joseph's residents, served at St. Joseph's pleasure.

Specifically, in its contract with the Medical Foundation, St. Joseph retained control of its residents. The contract provides that St. Joseph "shall appoint an Academic Chief of General Surgery who shall direct the total General Surgery Residency Program." It further provides that the Medical Foundation, a theoretically independent organization, can appoint its own Director of Surgical Education subject to St. Joseph's approval. But that Director must consult with St. Joseph's academic chief on all academic aspects of the integrated program. Further, St. Joseph appoints all residents that go to Brackenridge Hospital for medical training with the Medical Foundation, and "[s]pecific training assignments of residents and teaching staff of [the Medical Foundation] ... will be made by the [Medical Foundation's] Director of Surgical Education ... subject to the approval of the Academic

Chief of General Surgery at St. Joseph Hospital."

Notably, although St. Joseph purported to contract away its control of details of residents' medical tasks, St. Joseph actually specifically retained the right to control those tasks: "St. Joseph Hospital will not control the details of the medical tasks performed by the residents when they are assigned to [the Medical Foundation] save through ... the *mutual consent* of the Academic Chief of General Surgery at St. Joseph Hospital and [the Medical Foundation's] Director of Surgical Education." (Emphasis added). My colleagues complain that I overstate the significance of this contractual control.[12] But I remind my colleagues that in reviewing the trial court's judgment where the complaint is that the evidence is legally insufficient, this Court must look only at the evidence in a light that supports the trial court's judgment and disregard all evidence and inferences to the contrary.[13]

The record is replete with St. Joseph's efforts to fully comply with the Council's accreditation standards. And the evidence is virtually undisputed that St. Joseph exerted actual control over Dr. Villafani's work at Brackenridge Hospital. St. Joseph's Director of Medical Education, Dr. Ethan Natelson, summed it up: "St. Joseph retains control of their residents ...." It is not surprising, then, why the jury found as it did—that Dr. Villafani, when treating Ms. Wolff, was in the course and scope of his employment with St. Joseph.

As an example and in line with the Council's accreditation requirements, Dr. Villafani was supervised by more senior residents in St. Joseph's program. In fact, St. Joseph structured its residency pro-

---

**12.** 94 S.W.3d at 523.

**13.** *See Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 782 (Tex.2001); *see also Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001).

gram to have several surgery residents, each with different levels of experience, on rotation at Brackenridge simultaneously. The more senior residents exerted direction and control over the less senior residents during the process of patient care. Foremost, the whole purpose of St. Joseph's surgical residency program is to educate its residents through patient care. It is through patient care that St. Joseph gives its residents the hands-on experience necessary to prepare them for the practice of medicine. When Ms. Wolff entered the emergency room at Brackenridge, when she was designated a "teaching patient," and when she was assigned to Dr. Villafani, St. Joseph's resident, she became a part of Dr. Villafani's learning experience controlled by St. Joseph. St. Joseph's own Director of Medical Education stated that "[y]ou cannot train a medical school graduate in his specialty without the patients." The treatment of Ms. Wolff was essential to Dr. Villafani's medical education—the medical education provided by St. Joseph.

Not surprisingly, St. Joseph admits that it had the right to control Dr. Villafani's training—to assert otherwise would imperil its accreditation. In fact, St. Joseph's Director of Medical Education acknowledged that he could not think of "any other situation that exercises more control over physicians than a Residency Program."

In addition to the control St. Joseph retained and exercised to have an accredited residency program, St. Joseph received direct financial benefits from providing this residency program, including increased federal funding and reimbursements for its employees' salaries and benefits from the Medical Foundation out of revenue earned from billing for each resident's services. St. Joseph also received indirect benefits. Its residency program attracted more students and more surgeons to its facility, meaning it could pro-

vide services to the patients at a lower cost while recruiting qualified physicians to practice in its community. As well, the accredited residency program brought St. Joseph prestige in the health care community.

The relationship between Dr. Villafani and St. Joseph further demonstrates St. Joseph's pervasive control of its resident. St. Joseph selected Dr. Villafani to participate in its surgical residency program. Once selected, Dr. Villafani signed St. Joseph's employment agreement that dictated the terms of his employment with St. Joseph, and which set forth St. Joseph's expectations for Dr. Villafani's surgical rotation. St. Joseph determined the professional duties and standards of medical practice and controlled the amount and type of work Dr. Villafani was assigned. The employment agreement was clear that Dr. Villafani was to follow St. Joseph's policies and procedures while on rotation at Brackenridge. Truthfully, Dr. Villafani's resumé indicates that he received his residency training from St. Joseph, not the Medical Foundation.

St. Joseph operated a residency program in accordance with its accrediting body's regulations. It provided its residents with the resources necessary to achieve their goal of medical education and required the residents, in return, to devote themselves solely to St. Joseph's ends. The undisputed evidence shows that Dr. Villafani's patient care was part of his academic training, which St. Joseph retained the right to control. Thus, not only is there more than a scintilla of evidence to support the jury's findings that Dr. Villafani was acting in the course and scope of his employment with St. Joseph when he treated Ms. Wolff, but the evidence establishes that he was so acting as a matter of law.[14]

---

**14.** *See, e.g., Darensburg v. Tobey,* 887 S.W.2d 84, 88–90 (Tex.App.-Dallas 1994, writ denied).

Employers are generally liable for their employees' acts that fall

> within the scope of the general authority of the employee. It is not essential that the negligent act or omission should have been expressly authorized by the employer so long as it is in furtherance of the employer's business and for the accomplishment of the object for which the employee is employed.[15]

Dr. Villafani's treatment of Ms. Wolff was: (1) within the scope of his general authority; (2) in furtherance of St. Joseph's business of educating medical residents through patient care; and (3) for the accomplishment of the object for which Dr. Villafani was hired.[16] Thus, because Ms. Wolff's treatment was within the scope of Dr. Villafani's employment, St. Joseph Hospital is vicariously liable under *respondeat superior* for Dr. Villafani's negligence.

In holding otherwise, my colleagues simply ignore the reality of medical residency programs. They seem to be influenced by the arguments that if St. Joseph wasn't standing over Dr. Villafani's shoulder at the precise time he provided medical treatment to Ms. Wolff, then St. Joseph was not exercising control. This reasoning is apparent in the plurality's opinion. Paraphrasing, it says that "St. Joseph set . . . the kinds of procedures [Dr. Villafani] performed," but with respect to patient care, it was a different situation.[17] According to the plurality, then, St. Joseph controls what treatment Dr. Villafani can perform, but St. Joseph didn't control Dr. Villafani's performance of that treatment. What nonsense! Shamelessly, the plurality confesses, as it must, that Dr. Villafani is supervised by "more senior residents,"[18] but hopes the reader forgets that these "more senior residents" are St. Joseph's own residents. The plurality, in essence, says that St. Joseph has no direct control over Dr. Villafani's patient care, because, in fact, it is St. Joseph's employees who exercise control and not St. Joseph. More nonsense.

At most, my colleagues can point only to evidence showing that St. Joseph shared control over Dr. Villafani with the Medical Foundation. But that isn't enough to find as a matter of law that Dr. Villafani was the borrowed servant of the Medical Foundation. According to the *Restatement,*

> In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.[19]

In short, when the general employer only shares its right to control its employee, that employee cannot be the borrowed servant of the special employer.[20] As long as St. Joseph retained control over Dr. Villafani's residency, he could not be the borrowed servant of the Medical Foundation.

As my colleagues agree, by contract, St. Joseph had the "ultimate responsibility" over Dr. Villafani in the residency pro-

---

15. *Leadon v. Kimbrough Bros. Lumber Co.,* 484 S.W.2d 567, 569 (Tex.1972).

16. *See, e.g., Darensburg,* 887 S.W.2d at 89.

17. 94 S.W.3d at 542.

18. *Id.* at 543.

19. Restatement (Second) of Agency § 227 cmt. b (1958).

20. *See Lara v. Lile,* 828 S.W.2d 536, 538 & n. 2 (Tex.App.-Corpus Christi 1992, writ denied).

gram.[21] And as they admit, St. Joseph exercised control over Dr. Villafani's patient care. While my colleagues try to distinguish academics versus patient care, they admit, again, as they must, that the academic portion of the program necessarily includes patient care. Simply, there is no difference in the exercise of control over academics and the exercise of control over patient care in this or any other surgical residency program.

The contract between St. Joseph and its resident, Dr. Villafani, and the contract between St. Joseph and the Medical Foundation demonstrate that St. Joseph exercises control over Dr. Villafani's patient care, and the undisputed evidence shows that St. Joseph exercised actual control over Dr. Villafani. Thus, Dr. Villafani cannot be the borrowed servant of the Medical Foundation as a matter of either fact or law. I would overrule St. Joseph's complaint that either the trial court erred in not instructing the jury on borrowed servant or in failing to find as a matter of law that Dr. Villafani was the borrowed servant of the Medical Foundation.

A hospital may have employees who are doctors for whom it may be vicariously liable, and there was evidence in this case to support the jury's finding that Dr. Villafani was St. Joseph's employee, acting in the course and scope of his employment, when he negligently injured Ms. Wolff. Additionally, because St. Joseph contractually retained and actually exercised the right of control over Dr. Villafani's work even when he was at Brackenridge, he could not have been the borrowed servant of the Medical Foundation. Further, because I conclude that there was legally sufficient evidence to support the jury's finding that Dr. Villafani was in the course and scope of his employment with St. Joseph when he negligently injured Ms.

Wolff, I do not reach the question of joint enterprise, joint venture, and other theories of vicarious liability presented by Ms. Wolff. Finally, I agree with the court of appeals' reasoning that the trial court's error, if any, in failing to submit the negligence of the two settling drivers was harmless. Consequently, I would affirm the court of appeals' judgment.