Opinion issued November 25, 2014



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-01034-CV

————————————

**SHIRLEY LENOIR, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF SHANA LENOIR AND CHRISTOPHER MCKNIGHT, INDIVIDUALLY AND AS NEXT FRIEND OF NAYLA MCKNIGHT, Appellants**

**V.**

**LEAH ANNE GONSKI MARINO F/K/A LEAH ANNE GONSKI AND JAOU-CHEN HUANG, M.D., Appellees**

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-35806A**

## O P I N I O N

This is a healthcare liability case brought against two physicians, a nurse, and a medical clinic, following the death of a patient of the UT Physicians clinic of

Houston, Shana Lenoir, and her two unborn children hours after she received prenatal care at the UTP clinic. Suit was filed by Lenoir's mother, Shirley Lenoir, and the father of her only living child, Christopher McKnight, in their individual and representative capacities (collectively referred to as "Lenoir").

Dr. Gonski, who treated Shana, and Dr. Huang, who was the attending physician at the UTP clinic where Shana was treated, both moved for dismissal of the claims against them. They argued that they were employees of governmental units, acting within the scope of that employment and, as a result, the election-of-remedies provision of the Texas Tort Claims Act mandates their dismissal. The trial court granted the motions and dismissed both physicians from the suit.

In three issues, Lenoir contends that neither physician was entitled to dismissal and challenges the affidavits submitted on their behalf as conclusory. We overrule the challenge to the affidavits, affirm the trial court's judgment dismissing Dr. Huang, reverse the portion of the judgment that dismisses Dr. Gonski, and remand for further proceedings against Dr. Gonski.

## Background

Shana Lenoir went to UTP clinic for prenatal care when she was approximately 32–35 weeks pregnant with twins. Because the physician she was scheduled to see was unavailable, she was seen by Dr. Gonski, who was a second-year medical resident. Shana told Dr. Gonski that, during an earlier pregnancy, she

had a preterm delivery of twins only five and one-half months into her pregnancy. One of the babies died; the other required extensive medical care and was in the neonatal intensive care unit for over four months. Dr. Gonski prescribed weekly injections of progesterone. A nurse gave Shana her initial progesterone injection while she was still at the UTP clinic.

Several hours later, Shana began having difficulty breathing. McKnight called for emergency medical assistance, but she collapsed before help arrived. Shana was taken by EMS to Memorial Hermann Hospital; however, she and both of her unborn children died before they arrived at the hospital.

Lenoir sued the treating physician (Dr. Gonski), the attending physician overseeing Dr. Gonski's provision of medical care (Dr. Huang), the nurse who injected the medication under Dr. Gonski's orders, and UTP clinic. Drs. Gonski and Huang moved for dismissal under section 101.106(f) of the Texas Tort Claims Act, arguing that dismissal of the healthcare liability claims asserted against them was mandated by the election-of-remedies provision of the sovereign immunity statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f) (West 2011). Dr. Gonski asserted that she was an employee of the University of Texas System Medical Foundation, a nonprofit corporation that appoints medical residents to the University of Texas Health Science Center at Houston residency program. Dr. Huang asserted that he was an employee of the UT Health Science Center at

3

Houston and was overseeing the work of the UT residents, including Dr. Gonski, at the UTP clinic as part of that employment. All parties presented affidavits and other evidence to the trial court. Following a hearing on the motions, both physicians were dismissed from the suit.

A party against whom a dismissal order is entered based on sovereign immunity may bring an interlocutory appeal of that order. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014 (West Supp. 2014). In this interlocutory appeal, Lenoir argues that fact issues exist to prevent dismissal of the physicians.

**Standard of Review**

Generally, we review a trial court's order on a motion to dismiss under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001); *Kanlic v. Meyer*, 230 S.W.3d 889, 892 (Tex. App.—El Paso 2007, pet. denied). However, the proper standard of review is not necessarily determined by the type of motion to which the order relates, rather it is determined by the substance of the issue to be reviewed. *Singleton v. Casteel*, 267 S.W.3d 547, 550 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000)).

Here, the motion to dismiss raised an issue of immunity. *See id.*; *see also Franka v. Valasquez*, 332 S.W.3d 367, 371 n.9 (Tex. 2011) (stating that section 101.106 confers immunity in some instances to employees of governmental units).

4

If immunity applies, the trial court lacks subject matter jurisdiction over the case. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *see also Univ. of Tex. Health Sci. Ctr. at San Antonio v. Webber–Eells*, 327 S.W.3d 233, 240 (Tex. App.—San Antonio 2010, no pet.) (stating that section 101.106 is jurisdictional statute involving waiver of immunity). Subject matter jurisdiction is a question of law which we review de novo. *Miranda*, 133 S.W.3d at 226. Likewise, matters of statutory construction are reviewed under a de novo standard. *City of San Antonio v. Boerne*, 111 S.W.3d 22, 25 (Tex. 2003); *see Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009).

### Sovereign Immunity and Section 101.106 Dismissals

By common law, the State is immune from suit unless it consents by waiving immunity. *Texas Adjutant General's Office v. Ngakoue*, 408 S.W.3d 350, 353 (Tex. 2013). The State may waive immunity to the degree it sees fit taking into account public policy and financial considerations. *See Tex. Nat. Res. Conserv. Comm'n v. IT–Davy*, 74 S.W.3d 849, 854 (Tex. 2002). Waivers of sovereign immunity are construed narrowly given the policy considerations. TEX. GOV'T CODE ANN. § 311.034 (West 2013); *Ngakoue*, 408 S.W.3d at 353. Through the Tort Claims Act, Texas has chosen to establish a limited waiver of immunity in suits against the State for deaths proximately caused by the negligence of a governmental employee acting within her scope of employment if the death was

5

caused by a condition or use of tangible personal property and the governmental unit would, were it a private person, be liable to the claimant according to Texas law. TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (West 2011). The immunity applies to the State and to governmental units of the State. *See id.* The term "governmental unit" is defined by statute to include the State of Texas, all of its various agencies, political subdivisions, emergency service organizations, "and other institution, agency or organ of government the status and authority of which are derived from the constitution of Texas or from the laws passed by the legislature under the constitution." TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(3) (West Supp. 2013).

The State's sovereign immunity also impacts the suit against a government employee. Section 101.106 of the Texas Tort Claims Act, titled Election of Remedies, provides:

> (a) The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter.
>
> (b) The filing of a suit against any employee of a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against the governmental unit regarding the same subject matter unless the governmental unit consents.
> .  .  .
> (f) If a suit is filed against an *employee* of a governmental unit based on conduct *within the general scope of that employee's employment*

6

and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.106 (West 2011) (emphasis added).

This law forces plaintiffs to decide "at the outset" whether an employee acted independently (which could lead to individual liability) or acted within the general scope of her employment (such that the governmental unit would face potential vicarious liability). *Mission Consol. Indep. School Dist. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008). Because it is an irrevocable decision, "a plaintiff must proceed cautiously before filing suit and carefully consider whether to seek relief from the governmental unit or from the employee individually." *Id.* This law "strongly favors dismissal of governmental employees." *Anderson v. Bessman*, 365 S.W.3d 119, 124 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

It is not a prerequisite to dismissal of a government employee under section 101.106(f) that the plaintiff be able to successfully pursue a tort action against the governmental-unit employer. *See Franka*, 332 S.W.3d at 381. Any tort action brought against a government employee acting in the general scope of her employment is one that "could have been brought under this chapter against the governmental unit," even if the particular tort alleged is one for which sovereign

7

immunity has not been waived. *See id.* at 378, 381 & n.66 ("Recovery for the negligence of a government physician acting in the course of employment would be limited to that afforded under the Act."); *see also Williams v. Nealon*, 394 S.W.3d 9, 13 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (noting that *Franka* removed from defendant-employee burden to show that suit could have been successfully maintained against government).

Thus, to obtain summary dismissal under section 101.106(f) of the Tort Claims Act, the defendant employee has the burden to establish—as a matter of law—that she is (1) an employee of a governmental unit (2) working in the general scope of her employment. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f); *Franka*, 332 S.W.3d at 375; *Kelemen v. Elliott*, 260 S.W.3d 518, 524 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Williams*, 394 S.W.3d at 13. Evidence that is disputed or insufficient cannot support a dismissal. *Franka*, 332 S.W.3d at 375; *see also Dallas Area Rapid Transit v. Thomas*, 168 S.W.3d 322, 327 (Tex. App.—Dallas 2005, pet. denied). This standard protects the interests of the State by allowing dismissal when immunity exists while also protecting the injured claimants from dismissal on disputed facts. *See Miranda*, 133 S.W.3d at 228.

Section 101.001(2) defines an "employee" of a governmental unit as follows:

> "Employee" means a person, including an officer or agent, who is in the *paid service* of a governmental unit by competent authority, but

8

does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the *legal right to control*.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(2) (West Supp. 2014) (emphasis added). The burden is on the employee to show that she meets the statutory definition. *See Miranda*, 133 S.W.3d at 227–28 ("If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder. . . ."). The court must "take as true all evidence favorable to the nonmovant" and "indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id.* "[T]his standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Id.*; *Watkins v. Isa*, No. 04-11-00622-CV, 2012 WL 2021929, at *3 (Tex. App.—San Antonio June 6, 2012, no pet.) (mem. op.).

### Dr. Gonski

In her motion to dismiss, Dr. Gonski maintained that she was an employee of the UT Foundation, which she alleged qualified as a governmental unit.[1] Her evidentiary support included her own affidavit, the affidavit of the director of her residency program, and documents prepared by the Foundation and the Health Science Center. Her affidavit states that she was appointed to the Health Science

---

[1] Although the Health Science Center is indisputably a governmental unit, Dr. Gonski maintains that she was the employee of the Foundation, not the Health Science Center.

9

Center's residency program by the Foundation and was employed by the Foundation when she treated Lenoir. She further avers that she was compensated by the Foundation and obligated to abide by the policies and procedures in its resident handbook, as well as the policies and procedures of the Health Science Center and the UT System generally. She attached a paystub, which indicates that she received her salary from the Foundation.

To demonstrate an employment relationship with the Foundation, Dr. Gonski was required to establish as a matter of law that, among other things, the Foundation had the legal right to control her work. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f); 101.001(2); *Murk v. Scheele*, 120 S.W.3d 865, 867 (Tex. 2003) (holding that UT Health Science Center faculty-physician was properly dismissed because Health Science Center had right to control his work). The nature of the medical residency program here raises fact issues because residents, like Dr. Gonski, are hired by one institution (UT Foundation) to work at a second location (UTP clinic) under the supervision of faculty physicians employed by a third entity (Health Science Center). *See, e.g.*, *Murk*, 120 S.W.3d at 867 (holding that Health Science Center resident was not employee of Health Science Center because resident was paid by another entity, Bexar County Health District, which operated hospital where resident and faculty-physician were both working).

10

The complex relationships that exist to afford medical residents hands-on training by more experienced physicians was discussed in the Texas Supreme Court case, *St. Joseph Hospital v. Wolff*, 94 S.W.3d 513 (Tex. 2002). There, St. Joseph Hospital in Houston operated a residency program that it "integrated" with another residency program operated by the Central Texas Medical Foundation. CTMF residents and medical staff provided medical care at Brackenridge Hospital, which was owned by another entity, the City of Austin.

The service contract between St. Joseph and CTMF provided that St. Joseph's Academic Chief would be responsible for appointing residents to the St. Joseph program, training them while assigned to work at St. Joseph Hospital, but also could assign them to CTMF in Austin, subject to CTMF's approval, for additional training. It further provided that residents assigned to work with CTMF would "provide direct patient care under the supervision of the teaching staff of CTMF" and that "St. Joseph Hospital will not control the details of the medical tasks performed by the resident when they are assigned to CTMF . . . ." *Id.* at 522–23, 543.

A patient treated by a resident at Brackenridge Hospital sued St. Joseph for the resident's negligence. St. Joseph argued that the resident was a borrowed employee of CTMF when he negligently treated the patient and therefore St. Joseph could not, as a matter of law, be vicariously liable as his employer for his

actions. The Texas Supreme Court agreed, holding that "the evidence is undisputed that [CTMF] had the right to direct and control the details of [the resident]'s medical treatment of [the Brackenridge patient]. Thus, regardless of any evidence that [the resident] was the general or regular employee of St. Joseph, he was acting as the borrowed employee of [CTMF] as a matter of law when he treated" the Brackenridge patient. *Id.* at 542–44. Therefore, St. Joseph could not be found vicariously liable for his negligent treatment of the patient as a matter of law. *Id.*; *see also Franka v. Velasquez*, 332 S.W.3d 367, 373 (Tex. 2011) (noting that, under three-party residency arrangement, resident was paid by one entity but under the legal right of control of another entity); *cf. Arvizu v. Estate of Puckett*, 364 S.W.3d 273, 276–77 (Tex. 2012) (holding that, in different context, employer had right to control work of its employee but another entity had right to control work of the employer-entity, such that both entities were liable for acts of employee).

The *Wolff* Court's analysis turned on the right to control the resident's work while he treated patients. That same issue is determinative of our analysis of Dr. Gonski's motion to dismiss. She argued that she was an employee of the Foundation. To determine whether the Foundation had the right to control her work, we consider the evidence regarding the relationship among the Foundation, the Health Science Center and UTP clinic, as it relates to a resident's treatment of patients at the UTP clinic.

12

**A.      Evidence regarding which entity had right to control Dr. Gonski's work**

Dr. Gonski is a degreed medical doctor who was in her second year of the Health Science Center residency training program when she treated Shana. She was appointed to the residency program by the Foundation. Though appointed and paid by the Foundation, the medical treatment she provided at UTP clinic was supervised by the Health Science Center physicians who ran the UTP clinic. We consider the evidence regarding each entity's role in the residency program and their control over the residents' work.

*1.      UT Health Science Center*

The Health Science Center sponsors a residency training program that allows physicians who have received their medical degree to continue their education and training through supervised care of patients at Health Science Center hospitals, internal clinics, and other sites operated by entities that have coordination agreements with the Health Science Center. The residency program is accredited by the Accreditation Council of Graduate Medical Education. Under that accreditation, the Health Science Center, as the sponsoring entity, "must provide its residents with a variety of effective educational experiences leading to their development as competent physicians." Residents interact with patients "under the guidance and supervision of faculty members . . . ."

The Health Science Center's residency program director holds the "authority and accountability for the operation of the program." The director is required to be a member of the staff of the sponsoring institution (here, the Health Science Center) and that director (Dr. Promecene), "together with the faculty, is responsible for recruitment, selection, instruction, supervision, counseling, evaluation, and advancement of residents" in the program.

The accreditation guidelines require that there be sufficient faculty available "to instruct and supervise all residents" at the participating sites. It is the responsibility of the sponsoring residency program to "demonstrate that the appropriate level of supervision is in place for all residents who care for patients." As such, the accreditation guidelines require that the Center's faculty "instruct and supervise all residents," maintain a "24-hour presence" in the hospital to supervise residents, and provide "on-site supervision" at all clinical locations. The Health Science Center "must assume ultimate responsibility for the program" including responsibility for "resident assignments at all participating sites."

### 2. *UT Physicians clinic*

The UT System Board of Regents has authorized the Health Science Center to establish a certified nonprofit health corporation to allow Health Science Center physicians to provide medical care to the public, continue their own training, and further educate and train medical students and residents under their supervision, for

14

the ultimate benefit of the community. UTP clinic is one of these "internal" clinics and is staffed exclusively by physicians who are full-time employees of the Health Science Center.[2] It is undisputed that the Foundation neither owns the UTP clinic nor has the right to control the provision of medical care provided to the UTP clinic's patients by the Health Science Center faculty physicians.

### 3. *The Foundation*

The Foundation is a nonprofit corporation. The University of Texas Board of Regents approved its creation in 1973. According to the Foundation's articles of incorporation, which have not been revised since that time, the Foundation has the authority to "employ qualified persons to serve as residents or interns on the staff of any hospital or hospitals either owned or operated by The University of Texas System, or any hospital or hospitals which may have an affiliation agreement with a medical component of The University of Texas System."

Under her appointment by the Foundation, Dr. Gonski was required to abide by the UT Graduate Medical Education Resident Handbook during her participation in the Health Science Center residency program. The handbook explains that the residents are appointed by the Foundation to the Health Science

---

[2]     The Health Science Center is required to have a program letter of agreement with each participating site, and the letter must identify the faculty who will supervise residents and specify the policies and procedures that will govern the resident's education during her assignment. Because UTP clinic is considered an internal site, there is not a program letter of agreement between the Health Science Center and UTP clinic.

Center's integrated resident training program. The Foundation's role is described as administrative: "The Foundation performs administrative and educational functions for the benefit of both the Resident Physicians and the Program . . . includ[ing] . . . issuance of paychecks and other personnel services, maintenance of records, procurement and administration of benefits provided by the Foundation, and provision of mechanisms for effective coordination of the Programs among the hospitals."

The handbook requires the residents to serve at the affiliated hospitals; accept the duties, responsibilities, and rotations assigned by the residency program director; and participate in the quality assurance activities of the clinical services to which he or she is assigned. The handbook states that the residents' provision of medical care must be supervised by residency program faculty: "All patient care must be supervised by qualified faculty." The requirement that faculty supervise residents is repeatedly emphasized: "It is essential that the program provide a closely supervised experience . . . ." This level of resident supervision "must" be provided because the attending physician "is ultimately responsible for that patient's care." The handbook further states, "Faculty members functioning as supervising physicians should delegate portions of care to residents, based on the needs of the patient and the skills of the resident." Relatedly, "[e]ach resident must know the limits of his/her scope of authority, and the circumstances under which

16

he/she is permitted to act with conditional independence" from the "supervision faculty members."

Paragraph Four of the Foundation's bylaws provides that "[a]ll physicians employed by the [Foundation] for the purpose of serving as a member of the staff of any hospital or hospitals that are neither owned nor operated by the corporation shall, in the performance of their duties as members of the staff of such hospital or hospitals, be subject to the direction and control of the hospital or hospitals upon whose staff he serves." Further, "[n]o physician employed by the [Foundation] shall serve upon the staff of a hospital not owned or operated by the [Foundation] unless and until the governing body of such hospital shall agree in writing to assume full responsibility for the direction and control of the acts of such physician while serving upon the staff of the hospital and shall further agree in writing to hold the [Foundation] harmless from all liability which may arise out of acts performed by such physician while engaged in the scope and course of his duties as a member of the staff of such hospital." The bylaws also provide that "[n]o director, officer, or employee of the [Foundation] shall be authorized to act on behalf of the [Foundation] to direct or control the acts of any physician employed by the [Foundation] while said physician is serving as a member of the staff of any hospital or hospitals not owned or operated by the [Foundation]."

Paragraph Five continues, "Physicians employed by the [Foundation] shall have no authority to engage in the practice of medicine for or on behalf of the [Foundation] except at a clinic, hospital, or other facility owned or operated by the [Foundation]. . . ."

Thus, medical residents, such as Dr. Gonski, who are employed by the Foundation but not working at a Foundation-owned hospital, are subject to the "direction and control" of the hospitals where they work. Consistent with that division of control and potential for subsequent liability, the hospital where the resident will work has to agree, in writing, to control the resident's work and indemnify the Foundation from any resulting liability. The Foundation's bylaws also provide that it will not indemnify residents with regard to the negligent practice of medicine: "The [Foundation] shall not reimburse or indemnify any . . . employee for any expenses or liability which may be incurred by such . . . employee while engaged in the practice of medicine."

By the terms of its bylaws, the Foundation has disavowed any right to control the work of the residents it appoints to the Health Science Center residency program and any liability for medical malpractice that might result from that work.

## B.     Dr. Gonski did not meet her burden

The evidence here fails to establish, as a matter of law, that the Foundation had the legal right to control Dr. Gonski's work at the time she treated Shana

18

Lenoir. The accreditation guidelines for her residency program specifically and repeatedly state that the scope of Dr. Gonski's authority to treat patients shall be determined by the Health Science Center faculty physicians and that those faculty physicians are responsible for supervising her work. The handbook mandates that residents be supervised by faculty physicians and accept the assignments given to them by the Health Science Center residency director. Furthermore, the Foundation's bylaws disavow any right to control Dr. Gonski's practice of medicine, except when she is working in a Foundation hospital, which she was not.[3]

The *Wolff* case involved a similar disavowment of the right to control a resident's work. The contract between St. Joseph and CTMF stated that St. Joseph did not have the right to control the work of its residents while assigned to CTMF for training.[4] The Texas Supreme Court held that that provision "makes it clear that St. Joseph in Houston had no direct control over 'the details of the medical tasks

---

[3]  It is undisputed that the Foundation does not own or operate any hospitals.

[4]  Paragraph G stated:

> The resident assigned to the Integrated Program will provide direct patient care under the supervision of the teaching staff of CTMF. CTMF's teaching staff will be under the supervision and direction of CTMF's Director of Surgical Education. . . . St. Joseph Hospital will not control the details of the medical tasks performed by the resident when they are assigned to CTMF . . . .

*St. Joseph Hospital v. Wolff*, 94 S.W.3d 513, 522–23, 543 (Tex. 2002).

19

performed by residents'" assigned to CTMF and treating patients at Brackenridge Hospital. *Wolff*, 94 S.W.3d at 543.

Gonski does not attempt to distinguish *Wolff*. Instead, she contends that the provision in the bylaws disavowing any right to control simply does not apply because "the care at issue did not occur in any hospital, but at a Clinic." The distinction is unconvincing because Dr. Promecene—who is the program director for the Health Science Center residency program to which Dr. Gonski was appointed—explains that UTP clinic is an "internal site" of the Health Science Center, such that it is considered a part of the Health Science Center just like Memorial Hermann Hospital and given the same exceptions under the residency program regulations that would be afforded other "internal" locations, like Memorial Hermann Hospital.

We have concluded that Dr. Gonski failed to establish, as a matter of law, that the Foundation had the right to control her work. Without establishing that a governmental unit has the right to control her work, a movant cannot establish that she is the employee of that entity to obtain dismissal under the election-of-remedies provision. *See* TEX. CIV. PRAC. & REM. CODE § 101.001(2) (defining "employee" eligible to take advantage of Tort Claims Act to exclude any person "who performs tasks the details of which the [employer] governmental unit does not have the legal right to control"); *Franka*, 332 S.W.3d at 372–73 (noting that

medical resident who was paid by one entity but under legal right of control of another entity did not meet the statutory definition of employee under the Tort Claims Act). We, therefore, also conclude that Dr. Gonski failed to establish that she was the employee of the Foundation. *See Adkins v. Furey*, 2 S.W.3d 346, 348 (Tex. App.—San Antonio 1999, no pet.) (holding that medical resident failed to conclusively establish that he was employee of Health Science Center that ran his residency program instead of hospital where he was working, and stating that employment was issue for jury); *see also Harris Cnty. v. Dillard*, 883 S.W.2d 166, 168 n.3 (Tex. 1994) (concluding that overly expansive reading of definition of "employee" would "reflect a view of governmental immunity not shared by the Legislature."). The trial court erred in granting Dr. Gonski's motion to dismiss.

We affirm Lenoir's first issue.

## Dr. Huang

Dr. Huang is a licensed physician who worked at the Health Science Center for nearly 20 years as an Associate Professor in the Department of Obstetrics, Gynecology, and Reproductive Sciences. The Health Science Center employs physicians to provide two forms of professional medical services: (1) to educate and train medical students and residents and (2) to provide inpatient and outpatient medical care to patients. Thus, Dr. Huang was required to provide medical care to patients in assigned hospitals and out-patient clinics, including UTP clinic, and to

21

supervise and train the Health Science Center's residents in those locations. On the day Shana Lenoir was treated at UTP clinic by Dr. Gonski, Dr. Huang was the attending physician, charged with supervising the medical residents there that day.

Lenoir does not dispute that the Health Science Center is a governmental unit. What she challenges is whether Dr. Huang was acting within the scope of his employment with the Health Science Center when he oversaw Dr. Gonski's care of Lenoir.

"Scope of employment" is defined by the Texas Tort Claims Act as the performance "of a task lawfully assigned to an employee." TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(5). This definition "is broader than the official immunity insulating state employees from liability." *Molina v. Alvarado*, 441 S.W.3d 578, 586 (Tex. App.—El Paso 2014, pet. filed). Thus, "an employee's scope of authority extends to job duties to which the official has been assigned, even if the official errs in completing the task." *Lopez v. Serna*, 414 S.W.3d 890, 894 (Tex. App.—San Antonio 2013, no pet.); *see Anderson*, 365 S.W.3d at 126 ("If the purpose of serving the employer's business motivates the employee, his acts are within the scope of employment.").

Dr. Huang's work included educational, research, and administrative services provided at Health Science Center-affiliated hospitals and clinics. He taught and supervised residents participating in the Health Science Center's

22

residency program. This supervision would occur at Memorial Hermann Hospital and in clinical settings, including UTP clinic. According to Dr. Huang's affidavit, his supervision of these residents and his work at UTP clinic were requirements of his employment at the Health Science Center and necessary for his compensation. He was the assigned attending physician at the UTP clinic on the day Lenoir received treatment there and, in that capacity, was required to supervise the residents providing care at the clinic, including Dr. Gonski. We, therefore, conclude that Dr. Huang was performing a task assigned to him by his employer and acting within the scope of his employment with regard to Lenoir's treatment.

We reject Lenoir's argument that alleged violations of Medicaid billing requirements cause Dr. Huang's actions to be ultra vires and expose him to individual liability without the benefits of sovereign immunity protection. This argument relies on a 1987 case that held that "[u]nlawful or unauthorized acts are not considered acts of the State" and State officials can be sued in their individual capacities for wrongful unofficial acts. *Bagg v. Univ. of Tex. Med. Branch at Galveston*, 726 S.W.2d 582, 585–86 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.).

More recent case law establishes, though, that an employee acts within the general scope of his employment if he is discharging the duties generally assigned to him even if he does so in a negligent manner. *See City of Lancaster v.*

*Chambers*, 883 S.W.2d 650, 658 (Tex. 1994) (rejecting argument that employee police officers were outside scope of employment because they had no authority to drive dangerously); *Hopkins v. Strickland*, No. 01-12-00315-CV, 2013 WL 1183305, at *3 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.) (stating that "an act may still be within the scope of the employee's duties even if the specific act that forms the basis of the civil suit was wrongly or negligently performed, so long as the action was one related to the performance of his job."); *Lopez*, 414 S.W.3d at 894) (holding that "employee's scope of authority extends to job duties to which the official has been assigned, even if the official errs in completing the task."); *Anderson*, 365 S.W.3d at 126 ("If the purpose of serving the employer's business motivates the employee, his acts are within the scope of employment.").

A governmental employee can act within the scope of his employment, discharging the duties assigned to him, even if it is later determined by a court that some error was committed in connection with the actions taken. *See Ballentyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 425 (Tex. 2004) (concluding that board of adjusters members were discharging duties assigned to them even though later judicial decision established that board action was incorrect).

Accordingly, we overrule Lenoir's second issue.

**Challenge to Affidavits**

In Lenoir's third and final issue, she challenges affidavits relied on by Dr. Huang in support of his motion to dismiss. Lenoir objected to an assertion in Dr. Huang's affidavit that he "was in the paid service of" the Health Science Center on the day Dr. Gonski treated Lenoir and to the affidavit of the Health Science Center's Senior Executive Vice President confirming Dr. Huang's statement. She objected that these affidavits were "legally conclusory and factually incorrect" based on her legal argument that UTP was engaged in an "auxiliary enterprise" because the fees charged to patients of the clinic passed through a trust fund before ultimately being used by the Health Science Center to pay its physicians' salaries.

Lenoir further objected to the affidavits of Dr. Promecene, the head of the Health Science Center residency program, and Dr. King, who is president of the Foundation. Lenoir again alleges that these affidavits contain "legal conclusions not supported by facts."

The trial court did not rule on Lenoir's objections.

## A.    Standard of review

An objection that an affidavit is conclusory is an objection to the substance of the affidavit that can be raised for the first time on appeal. *See Skelton v. Comm'n for Lawyer Discipline*, 56 S.W.3d 687, 692 (Tex. App.—Houston [14th

Dist.] 2001, no pet.); *Green v. Indus. Specialty Contractors, Inc.*, 1 S.W.3d 126, 130 (Tex. App.—Houston [1st Dist.] 1999, no pet.). Lenoir did not have to obtain a ruling on her objections to preserve this issue for appeal. *Green*, 1 S.W.3d at 130. We review an assertion of trial court error regarding the admissibility of evidence under an abuse of discretion standard. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000).

## B.    Affidavits were not conclusory

Conclusory statements in affidavits are insufficient to establish the existence of a fact. *See, e.g., Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984); *James L. Gang & Assocs., Inc. v. Abbott Labs., Inc.*, 198 S.W.3d 434, 442 (Tex. App.—Dallas 2006, no pet.). "A conclusory statement is one that does not provide the underlying facts to support the conclusion." *Weech v. Baptist Health Sys.*, 392 S.W.3d 821, 826 (Tex. App.—San Antonio 2012, no pet.) (quoting *Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex. App.—Houston [1st Dist.] 1997, no pet.)). Thus, an affidavit that is merely a sworn statement of the allegations in a pleading or that simply paraphrases statutory language is conclusory and lacks probative force. *See Selz v. Friendly Chevrolet, Ltd.*, 152 S.W.3d 833, 837 (Tex. App.—Dallas 2005, no pet.) (holding affiant's sworn repetitions of allegations in pleadings were conclusory and insufficient to raise fact issue on summary judgment); *Nichols v. Lightle*, 153

26

S.W.3d 563, 570 (Tex. App.—Amarillo 2004, pet. denied) (holding affidavit that merely paraphrased statutory language was conclusory and insufficient to raise fact issue on summary judgment). On the other hand, logical conclusions are not improperly conclusory if they are based on underlying facts stated in the affidavit or its attachments. *Rizkallah,* 952 S.W.3d at 587.

Lenoir's contention that the affidavits are conclusory does not hinge on whether there are facts in the attached documents to support the statements made in the affidavits. Each of these affiants refers to documents or attaches them to their affidavit. These attachments include accrediting agency regulations, articles of incorporation, bylaws, and other supporting documents. The documents support the assertions made in the affidavits. *See id*.

Rather, she contends that the affidavits are "legally conclusory and factually incorrect" because—despite these affiants' understanding of the relationship Dr. Huang had with the UT entities and despite what the attached documents say—Lenoir's legal arguments have effectively *undone* the employment relationship.

These affidavits explain the interrelationship of the UT System entities and Dr. Huang's role and connection to those entities. We do not agree that an explanation of the UT System structure becomes inadmissible simply because a party argues that the law should interpret the facts differently. Because we have

rejected Lenoir's legal contentions on the merits of Dr. Huang's employment, we likewise reject her challenge that the statements are conclusory.

Accordingly, we overrule Lenoir's third issue.

## Conclusion

We overrule Lenoir's challenge to the dismissal of Dr. Huang. We further overrule her challenge to the affidavits attached to his motion to dismiss. We sustain Lenoir's issue challenging the dismissal of Dr. Gonski and, therefore, reverse that part of the trial court's judgment and remand for further proceedings against Dr. Gonski.


Harvey Brown
Justice

Panel consists of Justices Massengale, Brown, and Huddle.